In re **DREXEL BURNHAM LAMBERT GROUP, INC., et al., Debtors.**

In re **DREXEL BURNHAM LAMBERT REALTY, INC., Debtor.**

**Bankruptcy Nos. C10 6954 (MP), 90 B 10421 (FGC) and 91 B 10321 (FGC).**

United States Bankruptcy Court, S.D. New York.

Oct. 25, 1991.

See also 130 B.R. 910.

D. Bernstein, O. Lewis, Esq., Davis Polk & Wardell, New York City, for the Official Committee of Unsecured Creditors of Drexel Burnham Lambert Trading Corp.

H. Jones, New York City, U.S. Trustee.

M. Kirschner, Jones, Day, Reavis & Pogue, New York City, for the Official Committee of Unsecured Creditors of Drexel Burnham Lambert Group, Inc.

A. Miller, D. Deitsch–Perrez, Weil, Gotshal & Manges, E. Wallach, P. Merolla, Gen. Counsel, New York City, for Drexel Burnham Lambert Group, Inc.

C. Montgomery, Milgrim, Thomajan & Lee, New York City, for the Official Committee of Equity Security Holders.

M. Zelmanovitz, Esq., Zalkin, Rodin & Goodman, New York City, for the Official Committee of Unsecured Creditors of Drexel Burnham Lambert, Inc.

## MEMORANDUM OF DECISION ON REASONABLENESS OF PROFESSIONAL FEES

FRANCIS G. CONRAD, Bankruptcy Judge.

This matter [1] is before us by result of our May 23, 1991 bench order directing certain professionals (Attorneys, Accountants, Investment Bankers/Advisors) to submit proprietary data, under seal, on how their firms calculate rates and disbursements charged to the Drexel Burnham Lambert Group, Inc. (DBL) bankruptcy estate. An evidentiary hearing was conducted on August 8, 1991.

The review of professional fees by a Court, particularly when, as here, many of the professionals, although not all, have performed in an exemplary manner, is distasteful to the Court and demeaning to the professional. Unfortunately, however, it is mandated by the Bankruptcy Code, § 330.

The analysis of professional rates is a classic case of statutory construction. The starting point in every case involving statutory construction is the language itself. *In Re Burke Mountain Recreation, Inc.*, 64 B.R. 799, 802 (Bkrtcy.D.Vt.1986). Section 330's standards do not stand in isolation, however. We need to look at § 330 as it relates to the fundamental changes specifically wrought by the enactment of the 1978 Bankruptcy Code, the practical results of other changes made by the Code, and the reality of modern economic life.

The first and foremost change Congress specifically enacted in 1978 was that attorneys or other professionals whose retentions have been approved by the Bankruptcy Court are to be compensated based on market rates, rather than the principle of "strict economy." Congress explicitly rejected the Judge-created notions or stan-

---

1. We have jurisdiction to hear this matter under 28 U.S.C. § 1334(b) and the general reference to this Court, dated July 10, 1984 (Ward, C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(A). This Memorandum of Decision constitutes conclusions of law under F.R.Civ.P. Rule 52, as made applicable by Federal Rules of Bankruptcy Procedure Rule 7052.

dards that "economy of the estate" required the bankrupt's estate to compensate attorneys at less than the rates established by the free market. In rejecting the prior standard for awarding professional compensation, and insisting on a standard established by the free market (tempered by other factors discussed herein) for the purchase and sale of professional services, Congress explicitly made known its intention to avoid the problems that existed from the inevitable operation of "Gresham's Law," created by the prior standard, that is, low fees drive competent professionals away from bankruptcy or to those bankruptcy-involved clients who would pay market rates.

The second substantial change Congress specifically enacted in 1978, which bears on the general issue before us, was a fundamental change in the system of case administration. No longer would Bankruptcy judges or the Securities and Exchange Commission play a business role in a corporate reorganization case.[2] Rather, Congress commanded that the debtor and committees of creditors and security holders, supplemented with professionals to the extent the Bankruptcy Court deemed appropriate, should guide a corporate reorganization. The debtor and the committees would negotiate and hopefully fashion a consensual plan that would result from the particular calculus of facts, leverages, and interests available to each constituency. Official committees were intended to play a central role in this process.

Substantial discretion resides in the Bankruptcy Court to authorize the number of committees and professionals needed, based on the particular facts of each case. Where a Bankruptcy Court has authorized multiple committees, it has done so usually because the interests of various constituencies are substantially different and cannot be represented by the debtor or a single committee. Those committees, and the professionals they are permitted to retain, have interests by definition that conflict with the interests of others. Those committees and their retained professionals are charged with the duty to advance their constituencies' specific interests in the reorganization process, but always tempered by their fiduciary duty to the debtor.

The practical development that has occurred since the enactment of the 1978 Code, at least with respect to complex corporate reorganization cases under Chapter 11, is that the skills of a "pure bankruptcy" legal specialist have had to be augmented by the specialized legal skills of other areas of sophisticated legal practice. Aside from railroad reorganizations and reorganizations occasioned by underlying fraud, there were comparatively few substantial corporate reorganizations during the period from the end of World War II to the enactment of the Code in 1978. In 1978, the Code eliminated any "insolvency" requirement as a precondition for a corporation filing for reorganization. The Code expanded the scope of "claims" that could be dealt with in a reorganization proceeding and encouraged, by a variety of mechanisms, the availability of Chapter 11 as a "fresh start" for a corporate debtor. Because of these legal changes and the slow but inexorable changes in the national and international economies, corporations could and did seek to reorganize through Chapter 11 in a wide variety of contexts.

Corporate life itself had become far more complex than in 1898 when the Bankruptcy Act was enacted, or than in 1938 when the former Chapters X and XI were added. Corporate life has become even more complex since the 1970's, when the Code was being debated and drafted. By the late 20th century, the complexity of corporate and capital structures occasioned or dictated by a myriad of operational, competitive, tax and regulatory considerations at the state, federal and international levels, and the legal problems to be faced once a Chapter 11 petition was filed have been extraordinarily more diverse and complex than those of the prior 75 years.

2. Whether this change as it pertains to bankruptcy judges has been completely effectuated remains to be seen.

Corporate reorganizations present substantial legal issues in addition to, but separate from, bankruptcy law. There is no dispute that an attorney retained under § 327 has to be expert in bankruptcy law. Whatever problems exist must be handled within the complex of rights and obligations created by the Bankruptcy Code to achieve a plan meeting the requirements of § 1129. In corporate reorganizations today, the retained attorney must often have access to additional legal expertise not thought of as "bankruptcy law" expertise. These areas of "non-bankruptcy" legal expertise in corporate reorganizations often include, for example, tax (federal, state, local, and international); a wide variety of areas of state and federal regulatory law (*e.g.*, labor, PBGC, SEC, DOT); specialized areas of litigation (*e.g.*, securities, antitrust, product liability); corporate divestitures; and the latest forms of corporate finance. Debtors and committees today often retain special counsel for such specialized expertises to supplement and support bankruptcy counsel.

These examples vividly demonstrate the wide variety of "non-bankruptcy" legal topics that debtors and official committees, and their retained counsel, have to address to represent adequately their respective constituencies in large cases, and, in particular, in the formulation of a plan. This consideration that the legal practice "in" bankruptcy is not just the legal practice "of" bankruptcy law bears upon the issue addressed by this memorandum: compensation of attorneys for their services at market rates.

The general standard for compensating and reimbursing a retained attorney (or other professional whose practice is to bill on an hourly rate basis) is to multiply the number of hours worked by a regularly utilized and accepted billing rate. As detailed below, we, of course, scrutinize the attorney's time records to determine whether any of the time recorded should not be compensated at the requested rate or at all. In a reversal of the practice that had evolved under the former Bankruptcy Act, however, Congress directed Bankruptcy Courts to compensate lawyers at the market rate, reflected in rates generally accepted by the attorney's clients, and not impose lower or different rates or charges simply because it is a reorganization proceeding. To appreciate the substantial change Congress made in 1978, a brief review of prior law is required.

The Bankruptcy Act did not contain a specific section dealing with compensation of retained professionals. Rather, the Courts developed on their own an approach that sought to conserve the assets of the estate. *See, In re Emergency Beacon Corp.,* 43 B.R. 672, 675 (Bkrtcy. S.D.N.Y.1984) ("notion of economy of the estate … developed in the case law over many years"). This approach was then incorporated into general orders, and eventually into Former Bankruptcy Rule 219(c). Under that rule, professionals were allowed "reasonable" compensation, with the Court to give "due consideration to the nature, extent, and value of the services rendered as well as to the conservation of the estate and the interests of creditors." Former Bankruptcy Rule 219(c). Under the direction to conserve estates, Courts "generally compensated attorneys … at rates lower than such attorneys would be paid if privately employed." *In re Kero–Sun, Inc.,* 59 B.R. 630, 632 (Bkrtcy.D.Conn. 1986), *aff'd,* 71 B.R. 117 (S.D.N.Y.1987).

The Courts often justified invoking "economy" and "conservation" by referring to the "public interest" because bankruptcy administration was viewed as a public not a private matter. Attorneys, like receivers, were viewed as "officers of the court. As public servants, their compensation should never be as large as the compensation of those engaged in private employment." *In re Nat'l. Dep't. Stores, Inc.,* 11 F.Supp. 633, 638 (D.Del.1935), *aff'd,* 93 F.2d 127 (3d Cir.1937). The Courts took it upon themselves to draw the line between encouraging competent counsel to participate in bankruptcy cases and what the Courts, in each particular case, thought was appropriate "equity" to the debtor and creditors. *E.g., Massachusetts Mut. Life Ins. Co. v. Brock,* 405 F.2d 429, 432–33 (5th Cir.1968), *cert. denied,* 395 U.S.

906, 89 S.Ct. 1748, 23 L.Ed.2d 220 (1969); *In re Mabson Lumber Co.,* 394 F.2d 23, 25 (2d Cir.1968); *In re Yale Express System, Inc.,* 366 F.Supp. 1376, 1381 (S.D.N.Y.1973).

The invocation of "economy" and "conservation" resulted in inconsistent and arbitrary reductions of attorneys' hourly rates, with the Courts providing no real justification for the reductions. *See, e.g., In re Beverly Crest Convalescent Hosp., Inc.,* 548 F.2d 817, 820–21 (9th Cir.1976) (notwithstanding "remarkable record" of legal representation resulting in a company facing "a terminal financial disease" being restored to "robust financial health," rate of $85 per hour shocked the Court as "grossly excessive and clearly erroneous," and was replaced with an hourly rate of $65); *In re York Int'l Bldg., Inc.,* 527 F.2d 1061, 1073 (9th Cir.1975) ("to award a trustee in bankruptcy as just compensation almost five times the hourly rate of the district judge passing upon the award to the trustee shocks the conscience of the court.... Approximately twice the hourly rate of a district judge should be sufficient"); *Brock, supra,* 405 F.2d at 434 (after declaring that the "public interest" criterion had been ignored by the District Court, the Court of Appeals stated in conclusory fashion that $67 per hour was excessive); *Official Creditors' Comm. of Fox Markets, Inc. v. Ely,* 337 F.2d 461, 466 (9th Cir.1964) (reasonableness of fee award based on amount of Judge's salary), *cert. denied,* 380 U.S. 978, 85 S.Ct. 1342, 14 L.Ed.2d 272 (1965); *In re Nat'l Dep't Stores, supra,* 11 F.Supp. at 638–41 (Court allowances amounting to 50%, or even less, of the requested fee appear to have been plucked from the air.).

We are not aware of any study conducted of the effect that this approach to compensating attorneys retained by the debtor or committees in bankruptcy proceedings, and these fee decisions in particular, had on the quality of legal representation and legal product. It is appropriate to assume, as Congress did, that normal market forces operated: qualified lawyers left, or never entered, the arena of representing entities where compensation for legal services paid out of the estate was automatically lower than in private practice, and was still subject to uncertainty. We assume that such attorneys continued to participate extensively in bankruptcy, but did so on behalf of creditors who paid market rates.

In 1978, Congress fundamentally changed the standard by which professional rates are utilized by Bankruptcy Courts in awarding compensation under § 330 to professionals retained under § 327.

The rationale for the change was the understanding, premised on the most fundamental principles of economics, that the payment of arbitrarily lower rates to lawyers "in" bankruptcy proceedings versus those established by the market for "nonbankruptcy" legal services would result in attorneys leaving (or never entering) bankruptcy practice. In September 1977, urging a substantial change in compensating retained attorneys, the House Judiciary Committee warned:

> "(A)ttorneys that could earn much higher incomes in other fields would leave the bankruptcy arena. Bankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those *who could not find other work* and those who practice bankruptcy law only occasionally almost as a public service."

H.R.Rep. No. 595, 95th Cong., 2d Sess. 330, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 6286. Therefore, the House Committee called for compensating retained attorneys at market rates ("cost of comparable services"). The effect of the House's proposal was to "overrule *In re Beverly Crest Convalescent Hospital, Inc.,* 548 F.2d 817 (9th Cir.1976), which set an arbitrary limit on fees payable, based on the amount of a district judge's salary, and other similar cases that require fees to be determined based on notions of conservation of the estate and economy of administration." *Id.*

A year later, the Senate Judiciary Committee disagreed with the House's position. Its report stated that economy of adminis-

tration should remain an important objective. *See,* S.Rep. No. 95–989, 95th Cong., 2d Sess. 40, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5826. It claimed that the bankruptcy bar was flourishing and that "(t)he reference to 'the cost of comparable services' in a nonbankruptcy case is not intended as a change of existing law." *Id.* The Senate Judiciary Committee took the position that as the "basic objective," economy of administration should still be part of the balance that must be struck when compensating attorneys. *Id.* (citing, *Yale Express System, supra,* 366 F.Supp. at 1381).

When the bill that became the Bankruptcy Reform Act reached the floors of the House and Senate, however, the House view for compensating retained attorneys prevailed over the Senate view. The Senate specifically acceded to the House version of § 330 and the policy underlying the reformation of then-existing law. Both the floor managers in the House of Representatives and in the Senate expressly rejected contrary language in the Senate Report and agreed that, with respect to compensating retained attorneys, "(n)otions of economy of the estate in fixing fees are outdated and have no place in the bankruptcy code". 124 Cong.Rec. H11, 089 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S.Code Cong. & Admin.News 6436, 6442; 124 Cong.Rec. S17,406 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini), reprinted in 1978 U.S.Code Cong. & Admin.News 6505, 6511. Congress specifically decided that attorneys' rates for legal services should be established by the market. "(T)he policy ... is to compensate attorneys and other professionals serving in a case under title 11 *at the same rate as the attorney* or other professional *would be compensated for performing comparable services* other than in a case under title 11". 124 Cong. Rec. S17,406 at 6511 (emphasis supplied).

As enacted, the 1978 Code now provides that Courts may award to professionals employed under the Code:

(1) reasonable compensation for actual, necessary services rendered by such ... professional persons ..., based on the time, the nature, the extent, and the value of such services, the time spent on such services and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

11 U.S.C. §§ 330(a)(1) and (2).

Thus, the policy behind, and intention of, § 330(a) is incontrovertible. The practice of Bankruptcy Courts setting "appropriate" rates, or reducing rates otherwise accepted by the market for comparable services because of a notion of "economy of the estate," has been specifically rejected by Congress and abandoned in the statutory scheme.

The weight to be given to the market rate remains in dispute, however. Congress has mandated that we give careful scrutiny to the services provided to ensure the services are compensable, actual and necessary and reasonable. *See, In re STN Enterprises, Inc.,* 70 B.R. 823, 832 (Bkrtcy. D.Vt.1987).

Application by the Courts of the 1978 compensation standard with respect to attorney fee rates has evidenced a fidelity to Congress' intent to reject the principle of "economy of the estate" and to bolster the bankruptcy bar and practice in bankruptcy proceedings by allowing professionals to be compensated at market rates.

Numerous Courts in this Circuit have held that notions of "economy", resulting from using hourly rates lower than received in private employment, were abandoned under the Code. *See, e.g., In re Cena's Fine Furniture, Inc.,* 109 B.R. 575, 583 (E.D.N.Y.1990) (economy of the estate "theory was abandoned under the Code"); *In re Nine Assocs., Inc.,* 76 B.R. 943, 945 (S.D.N.Y.1987) ("the Code consciously abandons the spirit of economy which once dominated the Bankruptcy Court"); *In re Cuisine Magazine, Inc.,* 61 B.R. 210, 213 (Bkrtcy.S.D.N.Y.1986) ("the abandonment of the spirit of economy by the Code"); *In re Penn–Dixie Indus., Inc.,* 18 B.R. 834, 838 (Bkrtcy.S.D.N.Y.1982) ("the spirit of

strict economy of the Bankruptcy Act of 1898 has been abandoned").

Courts in other Circuits have reached the same conclusion. *See, e.g., Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.,* 778 F.2d 890, 897 (1st Cir. 1985) ("the principle of strict economy has been abandoned for reorganizations entered into after passage of the Bankruptcy Reform Act of 1978"); *In re Nucorp Energy, Inc.,* 764 F.2d 655, 658 (9th Cir.1985) ("Section 330 ... was intended to overrule the judicially fashioned doctrine of 'economy of the estate' "); *In re McCombs,* 751 F.2d 286, 288 (8th Cir.1984) ("Bankruptcy courts are no longer bound by pre-Code notions of frugality and economy in fixing fees"). Courts have held that the 1978 Code is designed to compensate attorneys at the market rate. *See, In re Gianulias,* 98 B.R. 27, 29 (Bkrtcy.E.D.Cal.1989), *aff'd,* 111 B.R. 867 (E.D.Cal.1989) ("there is no question that bankruptcy fees are to be awarded at market-based rates"); *In re Kero–Sun, Inc., supra,* 59 B.R. at 633 (§ 330 was "designed to compensate attorneys at the prevailing market rates for competent lawyers"); *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 578 (Bkrtcy. D.Utah 1985) ("Congress intended for market rates to govern allowances of fees in bankruptcy cases.").

Similarly, the Courts recognized that Congress' objective in requiring that the market, not the Court, establish attorneys' rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists. *See, e.g., In re RBS Indus., Inc.,* 104 B.R. 579, 582 (Bkrtcy.D.Conn.1989) ("the best and the brightest professionals are encouraged to practice in our bankruptcy courts"); *In re Nine Assocs., Inc., supra,* 76 B.R. at 945 (new provision is "an effort to attract professionals of the highest caliber").[3]

The need to attract and to retain talented professionals to practice "in" bankruptcy, and especially in corporate reorganizations,

has become more acute in recent years. The increasing number, size, and complexity of reorganization cases require not only the active and creative participation of experts in bankruptcy law, but also that of experts in a host of other legal specialties not thought of as "bankruptcy law." Indeed, such experts would not even consider themselves expert in "bankruptcy law."

Not every reorganization case, of course, necessarily requires specialized legal expertise other than bankruptcy. As we said *In re STN Enterprises, Inc., supra,* "Why should one pay Michelangelo to paint a barn?" *Id.,* 70 B.R. at 823, 842. But two general observations are pertinent. When we authorize the retention of multiple professionals, the decision is not made in the abstract. While we might not fully recognize the extent of the legal complexities that have to be faced, we recognize that a reorganization is not a "cookie cutter" or single issue case. Second, the creditors (with respect to committee counsel) and the debtors (with respect to debtors' counsel) have already made considered judgments, based on need and cost, to retain counsel with given expertise. They can choose to retain from a competitive field an attorney expert in bankruptcy law and additional attorneys with non-bankruptcy specialties, or one firm with bankruptcy expertise and other legal expertises. Creditors in corporate reorganization cases are not irrational consumers in terms either of the hourly rates to be charged by prospective counsel or the tasks that retained counsel perform. As this Court well knows, in reorganization cases committees interview many prospective attorneys, often at great depth, before selecting counsel and seeking Bankruptcy Court approval for retention under § 327.

With due recognition of the historical position of Bankruptcy Courts in compensation matters, we recognize that creditors have agreed to pay rates for retained counsel of their choice because of the needs of

---

**3.** *See also, e.g., In re Nucorp Energy, supra,* 764 F.2d at 658; *In re Casco Bay Lines, Inc.,* 25 B.R. 747, 754 (1st Cir. BAP, 1982); *In re Cena's Fine Furniture, Inc., supra,* 109 B.R. at 583; *In re Metro Transp. Co.,* 107 B.R. 50, 52 (E.D.Pa. 1989); *In re Pontiac Hotel Assocs.,* 92 B.R. 715, 716 (E.D.Mich.1988); *In re Kero–Sun, supra,* 59 B.R. at 632; *In re Atlas Automation, Inc.,* 27 B.R. 820, 822 (Bkrtcy.E.D.Mich.1983); *In re Penn–Dixie Indus., supra,* 18 B.R. at 838.

the particular case. One could posit other situations or cases where a presumption of prior informed judgment might not be as strong. Here, however, we have a multi-debtor, multi-committee case involving sophisticated creditors who have determined that the rates charged and tasks undertaken by attorneys are appropriate. We should not, and will not, second-guess the determination of those parties, who are directed by Congress, under the Bankruptcy Code, to shape and to resolve the case, and who are in fact bearing the cost. To do so, of course, would be to continue what Congress specifically intended to stop in 1978: Courts, instead of markets, setting rates, with the inevitable consequence that all the legal specialists required by the debtor or official committees would demur to participate. Indeed, in view of the Code's express deference to management staying in place in most Chapter 11 cases, it is perhaps anomalous that compensation of professionals is the one express area where management's economic decisions in purchasing services remains under such close supervision of the Court. Much of the post-filing economic activity of a debtor-in-possession in the ordinary course of events (*e.g.*, purchase of supplies, utilities, etc.) is not scrutinized after the fact, on the fair presumption that debtor management will make rational, cost-effective economic choices.

The same analysis and consideration applies with respect to reimbursement of expenses of retained professionals. If the market generally accepts a practice of reimbursing professionals for categories of items in addition to, but separate from, hourly rates, those should be reimbursed under § 330, subject of course to the Bankruptcy Court's review that the category was in fact necessary in the particular case. Indeed, subjecting professionals to a situation where expenses similar to those generally accepted by non-bankruptcy clients are not reimbursed (because of a visceral or *a priori* judicial notion that lawyers should not be reimbursed for a particular category of expenses) would undermine Congress' goals in legislatively overruling prior approaches to compensation. The general market acceptance of a practice, especially given the changing, dynamic nature of markets, must control overly rigid, inflexible, and individualized preconceived notions. The *Guidelines for Fees and Disbursements for Professionals* adopted on June 20, 1991 by the Judges of this District, for reimbursement of expenses and disbursements of retained professionals, recognizes to a substantial degree what is now generally accepted in this District, elsewhere and are consistent with this opinion.

This change has rapidly spread throughout our economy as a whole in the past 10 to 15 years. In recent years, many businesses, with the assistance of modern computer technology, have transformed their billing procedures from a lump-sum method to a usage method. The latter method ensures that heavy users of a particular service bear the cost of that service. This method has been adopted by many businesses in service industries such as hospitals and health care providers, telephone companies and universities, to name a few. The legal profession has followed this trend, which has generally been met with acceptance by purchasers of legal services. Accordingly, those clients who heavily use services are charged for that use, and those clients who do not use them are not charged. The use of this approach by attorneys, and its acceptance by clients, shows it is squarely in line with the "market" objective of § 330.

For the reasons set forth above, we hold Congress specifically intended, and § 330 now provides, that attorneys' rates and practices that are accepted by the market must be utilized as one of the criteria in establishing compensation under § 330 of the Bankruptcy Code.

Section 330 applies to the award of total compensation for a retained professional. It provides that the compensation must be reasonable. In determining the "reasonableness" of the requested compensation under § 330, Bankruptcy Courts

now utilize the "lodestar" method.[4]

> "It is now settled that the 'lodestar' method of fee calculation developed by the Third Circuit, *see Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir.1973) is *the* method to be used to determine a 'reasonable' attorney fee in all the federal courts, including the bankruptcy courts. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ('*Delaware Valley II*'); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) ('*Delaware Valley I*'); *Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *United States Football League v. National Football League*, 887 F.2d 408, 413 (2d Cir.1989)."

*In re Cena's Fine Furniture, Inc., supra*, 109 B.R. at 581. *See also, In re STN Enterprises, Inc., supra*, 70 B.R. 823, 842. The lodestar amount is calculated by multiplying the number of hours reasonably expended by the hourly rate, with the "strong presumption" that the lodestar product is reasonable under § 330. *See, Delaware Valley I*, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098; *In re STN Enterprises, Inc., supra*, 70 B.R. at 842.[5]

With respect to hourly rates, Congress intended that market forces set the rate. To that end, the statute focuses on the "cost of comparable services" in non-bankruptcy cases. 11 U.S.C. § 330(a). This analysis should, and often does, require the Court to consider the effect of delay in an attorney receiving compensation. Because of the timing sequence set forth in the Code for applications for interim compensation, and the added delay imposed by the very application process itself in bankruptcy, there is a far greater lag time between the provision of legal services and receipt of payment in bankruptcy than in the "comparable" non-bankruptcy market. The process is to look to the market rate for comparable services. *In re Cena's Fine Furniture, Inc., supra*, 109 B.R. at 583; *In re STN Enterprises, Inc., supra*, 70 B.R. at 843.[6]

As set forth in the affidavits of the legal professionals involved in this case, the hourly rates and fees charged are generally similar to those charged to, and paid by, the professionals' clients other than in services only "comparable" to those in non-

---

**4.** Some Courts in "common fund" cases have deemphasized the lodestar approach. *See, e.g., In re Terra–Drill Partnerships Sec. Lit.*, 733 F.Supp. 1127, 1130 (S.D.Tex.1990) (Pollack, J.) (noting a number of Circuits have held that a reasonable fee should be based on a percentage of the fund bestowed on the class). This is inappropriate for statutory fee cases like § 330. Statutory fee cases are governed by the various Supreme Court decisions relating to fee shifting statutes. *See, Terra–Drill, supra* at 1130 n. 2 ("Because the *Terra–Drill* litigation is a 'common fund' rather than a statutory fee case, the Supreme Court's decision in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711 [107 S.Ct. 3078, 97 L.Ed.2d 585] ... (1987) is inapplicable.").

For an excellent and short discussion about "common fund" cases and "fee shifting," *see, American Bankruptcy Institute's National Report on Professional Compensation in Bankruptcy Cases*, May, 1991.

**5.** The lodestar method replaced the process developed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). There,

the Fifth Circuit articulated a twelve factor approach for determining reasonable fee awards that was followed by the Bankruptcy Courts. *See, e.g., In re First Colonial Corp.*, 544 F.2d 1291, 1298–99 (5th Cir.), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *Boston & Maine Corp., supra*, 778 F.2d at 899; *Harman v. Levin*, 772 F.2d 1150, 1152–53 (4th Cir.1985); *McCombs, supra*, 751 F.2d at 287–88; *In re Yermakov*, 718 F.2d 1465, 1471 (9th Cir. 1983).

**6.** One verbal formulation is to look to "that fee which is customarily charged in the local community by someone who possesses similar skill, experience, expertise, stature and reputation who is faced with similarly novel and complex issues and who procures comparable results." *In re Navis Realty, Inc.*, 126 B.R. 137, 140 (Bkrtcy.E.D.N.Y.1991) (quoting, *In re Shades of Beauty*, 56 B.R. 946, 951 (Bkrtcy.E.D.N.Y.1986), *aff'd*, 95 B.R. 17 (E.D.N.Y.1988)). The applicants do not subscribe to a local rate standard in large, complex cases involving nationwide interest or implications. That issue, of course, is not presented here.

bankruptcy cases. Many of the services rendered "in" this reorganization case were identical to services rendered to "non-bankruptcy" clients, including corporate, tax (advice both for litigation and for structuring proposed transactions), federal class action securities litigation (both substantive and procedural), regulatory (Investment Company Act; ERISA; '33 Act; '34 Act), and criminal. A substantial percentage of the totality of the service represents, of course, "pure" bankruptcy law. The hourly rates and charges utilized reflect those accepted by the market in this District.[7]

With respect to the number of hours, we need no guidance on the general standard. Section 330 requires that the services sought to be compensated be actual and necessary. With respect to the application of that standard, several overall observations are pertinent.

First, the appropriate perspective for determining the necessity of the activity should be prospective: hours for an activity or project should be disallowed only where a Court is convinced it is readily apparent that no reasonable attorney should have undertaken that activity or project or where the time devoted was excessive. This is especially true where, after the fact, matters have ultimately been resolved by consent. The Court's benefit of "20/20 hindsight" should not penalize professionals. To help our foresight in this case, however, a master budget governing legal work to be performed has been in effect in this case since early this year. Several meetings with the Budget Committee and the professionals give us comfort that, while hours not worked cannot be quantified, there have been significant savings from the budget process in this case.

Second, the retained attorney, who is responsible to a committee or the debtor, must make practical judgments, often within severe time constraints, on matters of staffing, assignments, coverage of hearings and meetings, and a wide variety of similar matters. Such decisions must be presumed to be in utter good faith in view of an attorney's legal and ethical responsibilities. We also live in a practical world where attorneys need to work, and benefit from working, on multiple matters for different clients. A Court should not lightly assume, in retrospect, that an attorney of the precise level of judgment, experience, and knowledge was available but not used.

Third, attorneys in reorganization proceedings are agents of fiduciaries (the debtor or committees), with legal and professional obligations to the clients who retained them with prior approval of the Court. Attorneys are not independent actors. Absent concrete and unusual circumstances, *ex post facto* disallowance of compensation for activities or projects seriously threatens the attorney-client relationship in general, and may well threaten the basis of attorney-client privilege.

■ The professionals in this case were ordered to submit affidavits to this court, under seal, that reveal, describe and analyze how they determine rates. It is clear from these affidavits and voluminous supporting documentation that the rates being charged in this case are "market" for this district. Accordingly, we approve the rate structure used in this jointly administered case for the following firms:

Weil, Gotshal & Manges
Davis Polk & Wardell
Coopers & Lybrand
Deloitte & Touche
Milgrim Thomajan & Lee P.C.
Ernst & Young
Price Waterhouse
Jones, Day, Reavis & Pogue
Zalkin, Rodin & Goodman
Cahill Gorden & Reindel

After reflection, we have decided not to incorporate into this memorandum any detailed review of the disbursement practices of the subject firms because the new *Guidelines* of this District, effective July 1, 1991, govern many of the matters we would cover. *See* Appendix.

---

**7.** We recognize that the "market" in one district may be different from the "market" in another district.

Our discussion of this matter is not complete, however, without a discussion that incorporates investment bankers/advisors.

■ There is no doubt that investment bankers/advisors are subject to the professional retention requirements of § 327.[8] Under § 328(a), any professional may be retained "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis." Much of what we have said about attorneys and accountants is applicable to investment bankers/advisors.

■ To be compensated under § 330(a)(1), there must be an application that shows "reasonable compensation ... based on the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title...." *See, In re STN Enterprises, Inc., supra,* 70 B.R. at 831. Different compensation may be allowed from the original retention if, after the conclusion of such employment, such terms and conditions prove to have been improvident in light of developments not capable of being adjudicated at the time of fixing such terms and conditions.

The difficulty in assessing investment bankers'/advisors' fees is because (a) their retention applications are shortened versions of presentations made to debtors and committees; (b) their fee applications generally do not contain the specificity usually found in attorney and accountant applications; and, (c) many Bankruptcy Judges, including this Judge, are not completely familiar with the universe of services investment bankers/advisors perform. A most recent example of this confusion on the part of Bankruptcy Judges is indicated in *In re Hillsborough Holdings Corp.,* 125 B.R. 837 (Bkrtcy.N.D.Fla.1991). While the retention of investment bankers/advisors pre-Code was not unknown, there has been a recent deluge of investment bankers/advisors into the bankruptcy theater due to the change and complexity of Chapter 11 cases and reduced merger and acquisition opportunities. The difficulty in assessing investment banker/advisor compensation is further compounded because investment bankers/advisors generally do not bill by the hour, nor, as we have seen, are they able, without great difficulty and reluctance, to maintain time records to one-half of an hour.[9] With these preliminary thoughts in mind, we turn to what investment bankers/advisors in general do before we consider Goldin Associates, L.P. and the Rothschild, Inc. fee applications.

Investment bankers/advisors can be retained for a myriad of activities. Specifically, they can be retained as a financial advisor to evaluate a debtor's assets for a potential sale, restructuring or business combination; identify and contact potential purchasers; advise about potential offers; prepare confidential selling memoranda; render fairness opinions; prepare going-concern and liquidation scenarios; create pre-packaged plans of reorganization; assist in discussions and negotiations with lenders; draft definitive documentation; assist in compiling accurate financial, managerial, and cash flow information; and so on. The scope of the work in an individual case is limited by the retention order; the extent tested by fee application review.

Additionally, Investment bankers/advisors can be retained simply to sell some or all of a debtor's assets. Here, the result is usually easy to measure—the sale either took place or it didn't. The sale of a business by an investment banker, however, is far more complex than the sale of a residence by a real estate broker. Unfortunately, investment bankers in many instances want to be paid like residential real estate brokers but with none of the accountability required under the Code. Typically, this accountability can be established by demonstrating the substantial amount

8. *See, Guidelines for Fees and Disbursements for Professionals in the Southern District of New York for Bankruptcy Cases,* pg. 1, n. 1. Appendix attached.

9. *See, Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases.* Page 3 requires contemporaneous time records to tenths of an hour; appendix attached.

of preparation required before a sale takes place.

For example, a complex business sale is usually preceded by the preparation of a confidential sales memorandum. The memorandum, while generally comprehensive, does not and should not profess to represent the ultimate form of the transaction. Alternative tax strategies or timing considerations all require a real buyer before a sale can be fully elucidated. But even before the confidential memorandum can be prepared, there must be a compilation of the pertinent financial, investment, managerial, legal, industry, *etc.* data.[10] Data gathering and sifting takes time. It requires interfacing with a wide variety of professionals, both in-house and from other firms.

Like any good marketer, an investment banker/advisor must identify, contact, and qualify potential buyers. Qualification of a buyer can be almost as time consuming as investigating the company to be sold. Next offers, if any, must be reviewed. Negotiations must take place. More detailed due diligence about revenues, properties, etc. must be performed. Once a qualified buyer is found, further negotiation is needed to consummate the purchase and sales agreement. Upon execution of the agreement, there is, finally, the ultimate sale and its concomitant definitive documentation.

All of the above may occur and yet a sale may not follow. If the investment banker/advisor is working on a contingency basis and the sale falls through, the hours of hard work and conditional commission are lost. All this and more may occur even if the investment banker is merely serving as an advisor to the debtor on the value of its assets and liabilities and its options regarding them in a reorganizational effort. There is, however, great similarity of work between an investment banker/advisor hired on a contingency and those who are paid on a non-contingent basis.

Before we apply our discussion to the investment bankers and advisors before us, we need to discuss how their fees are calculated. Unlike attorneys and accountants working in bankruptcy, the vast majority of investment bankers/advisors usually work for a regular retainer, sometimes with a performance bonus. Rarely, but on occasion, they ask for indemnification and payment of professional fees they incur in reference to the engagement. We address these arrangements and considerations because they have either occurred or have the potential to occur in the DBL case.

For the purpose of evaluating rates in this case, we were provided with the compensation arrangements made with investment bankers/advisors in other Chapter 11 cases. They show:

| CASE | INVESTMENT BANKER | RETAINER |
| --- | --- | --- |
| Allegheny International (debtor) | Smith Barney | $ 90,000/mo. |
| Carter Hawley (committee) | Houlihan Lokey | $150,000/mo. |
| Cicle K. Corp. (committee) | Salomon Brothers | $100,000/mo. |
| Continental Airlines (debtor) | First Boston | $125,000/mo. |
| Continental Airlines (committee) | Smith Barney | $125,000/mo. |
| Doskocil Companies (debtor) | Goldman Sachs | $150,000/mo. |
| Eagle–Picher Industries | Goldman Sachs | $150,000/mo. |
| Eastern Airlines (debtor) | Smith Barney | $175,000/mo. |

10. This work is an example of "due diligence". *In re Hillsborough Holdings Corp.,* 125 B.R. 837, *supra,* represents an example of a lack of understanding of the term.

| CASE | INVESTMENT BANKER | RETAINER |
|---|---|---|
| Eastern Airlines (committee) | Goldman Sachs | $150,000/mo. |
| Federated Dept. Stores (bondholders) | Blackstone | $125,000/mo. |
| Federated Dept. Stores (secured lenders) | Gleacher & Co. | $250,000/mo. (reduced to $150,000 after 3 mos. but subject to a minimum) |
| Gillett Holdings Inc. (debtor) | Smith Barney | $150,000/mo. |
| Greyhound (debtor) | Goldman Sachs | $200,000/mo. |
| Hills Stores Company (debtor) | Blackstone | $150,000/mo. (plus possible bonus) |
| Insilco Corporation (debtor) | Lehman Bros. | $200,000 (plus possible bonus; reduced to $150,000 thereafter) |
| L.J. Hooker (committee) | Goldman | $175,000/mo. |
| Lomas (debtor) | Lazard Freres | $125,000/mo. (plus transaction fee) |
| Lomas (committee) | Prudential–Bache | $125,000/mo. |
| National Gypsum (debtor) | Donaldson, Lufkin | $125,000/mo. (for 4 months) |
| Public Service NH (committee) | Salomon Bros. | $150,000/mo. |
| Public Service NH (debtor) | First Boston | $150,000/mo. |
| Tracor | Blackstone | $ 75,000/mo. (there was also a sign-on bonus of $75,000) |

When we analyze the comparative fee arrangements without the benefit of the retention agreements in these cases, several trends seem clear. All investment bankers/advisors want sizeable monthly retainers regardless of the size of the case, the party represented, or the complexity of the case. Mathematically a correlation of fees, cases, and clients shows, at worst, incestuous fee-setting practices or, at best, oligopolistic behavior. From our experience in this case, and others, it is clear that the investment banking community starts with the retainer and works backward, using a variety of non-bankruptcy criteria to defend the fee charged.

Whenever we have dealt with investment bankers and financial advisors we have been left with the strong impression that for them the debtor is the cash cow to be milked, Chapter 11 the milking parlor, and the Judge the milking stool. Our impression has not been assuaged by an article we read in BNA's Bankruptcy Law Reports, p. 1178, 9–26–91. There, according to a poll, more than half the financial advisory firms that agreed[11] to abide by the new Southern District of New York Guidelines said they would take on clients only if: (1) the client had adequate liquidity; (2) the client was able to provide a substantial retainer; and (3) the court guaranteed a "bonus" or reward fees at the end of the

11. We are not sure if agreement is necessary because the *Guidelines* are mandatory. Any investment banker/advisor who seeks to be re-tained before this court will have to indicate it agrees to be bound by the *Guidelines* or it need not waste our time by seeking retention.

case. Our only comment about this poll is that it is clear the investment bankers want to sip the cream and leave the skimmed milk for others. To remedy what we perceive is a collision course between investment bankers/advisors and the Bankruptcy Code, and apparently a non-competitive market (unlike highly competitive attorney and accountant markets), we pen our requirements for the future retention of all investment bankers/advisors who seek to be retained before this court.

■ Any investment banker/advisor retention application submitted to this court must present the scope and complexity of the assignment, its anticipated duration,[12] expected results, required resources, the extent to which highly specialized skills may be needed and the extent to which they have them or may have to obtain them, projected salaries of participating professionals, billing rates and prevailing fees for comparable engagements,[13] current retentions in bankruptcy by the retained firm, and any estimated lost opportunity costs due to time exigencies of the job. In addition, the actual retention agreement between the investment banker/advisor and the client must be attached to the retention application and, the party retaining the professional must describe the process by which the financial banker/advisor has been selected. This latter requirement is aimed specifically at offsetting what we perceive as a lack of competitiveness in the selection process. Finally, the application must explain how the investment banker/advisor will eliminate, or at least reduce, the duplication of effort Judge Paskey alluded to in *Hillsborough*, 125 B.R. at 838–39, where there are armies of professionals apparently doing the same thing as the investment banker/advisor. Specifically, the intention is to avoid accountants and investment bankers/advisors massaging the same numbers twice when one trip to the masseuse would generally

suffice. We liken our requirements to a financial impact statement on the estate. Only with an advance picture of the job to be accomplished will we be able to measure the results (or lack thereof) achieved.

Although not an issue in the matter before us, a review of the retainers listed above reveals at least one firm that received a bonus. Recently *In Re Mortgage and Realty Trust*, 123 B.R. 626, 632 (Bktcy.C.D.Cal.1991) a bonus was denied because it was not deemed reasonable in that particular case.

■ To ensure some certainty in future retentions, we hold that end bonuses or sign-on bonuses are not *per se* barred by § 328. They do, however, require close scrutiny and, in appropriate circumstances, may be permissible.

■ The issue of indemnification and payment of professional fees has been raised in this case. We concur with Judge Bufford's holding *In re Realty Trust, supra,* that,

> the reason for hiring a person is that the person has special expertise that is beneficial to the debtor or the committee. The court expects that such professionals would be especially diligent in making sure that they meet the standard of care for exercising their expertise in their work in this case. Indemnification is not consistent with professionalism.

*In Re Realty Trust,* 123 B.R. at 630–31. Simply stated, indemnification agreements are inappropriate. Moreover, we know that investment bankers carry coverage to protect themselves from malpractice liability. This expense, like professional fees to negotiate a retention, are part of an investment banker's overhead, usually more than adequately covered by a retention fee.

With our discussion complete as to the matter under advisement we turn now to the applications of Goldin & Rothschild. We address Goldin first.

---

**12.** This information is needed so that time and cost of an engagement can be adjusted accordingly and the interests of the estate are protected.

**13.** These can be provided by a simple trend analysis graph based upon asset size, or something comparable. By itself, however, it is not sufficient to justify retention.

██ Goldin Associates, LP is special consultant and financial advisor to the Official Committee of Unsecured Creditors of Drexel Burnham Lambert Trading Corporation. Goldin is a financial advisory firm specializing in distressed situations. Unlike many investment banking firms it does not trade in securities. It is also a relatively small firm and new to its business, having started operation in 1990.

Goldin has acted as facilitator among the various constituencies in this case. It has also assisted in the form, structure and management of other future reorganized debtors. This has involved analysis of numerous proposed plans of reorganization.

In addition to the above, Goldin is a member of the Drexel Steering Committee, authorized in this case to review and analyze sale and disposition of debtor's assets. Finally, it advises the Official Committee of Unsecured Creditors of Drexel Burnham Lambert Trading Corporation.

When initially retained, Bankruptcy Judge Bushman refused Goldin a monthly retainer and capped services. No monthly retainer has been approved. Later, the services limit was increased to $100,000 per month. Finally, on May 23, 1991, we approved the continued retention of Goldin on a "zero based" [14] budget requirement in recognition of the need for future services contributed to the case.

Goldin avers that it sets its compensation on the basis of a number of considerations, including the scope and complexity of the assignment, the resources needed to service the matter, the anticipated duration of the work, the extent to which highly specialized skills possessed by certain Goldin employees may be required, the results sought and obtained and the firm's understanding of prevailing fees obtained in comparable engagements. See Goldin affidavit, pages 2 and 3.

Unfortunately, Goldin's affidavit falls far short of providing us with sufficient information about comparable rates in non-bankruptcy matters. Thus we are unable to make a finding as to the reasonableness of its rates.

And although Goldin does not bill by the hour, we have no baseline against which to measure Goldin's fee requests. Accordingly, we will direct that Goldin Associates submit a new retention application that complies with the retention requirements of this memorandum. Based upon the status of this case, and, pending receipt of the new retention application, we also set a ceiling of $50,000 on the amount of compensation allowable in any given month, subject to a final application. No retainer is allowed.

██ Rothschild Inc. is financial advisor to the Official Committee of the Drexel Burnham Lambert Group Inc. In summary fashion it has been required to understand and evaluate:

—in excess of 60 Drexel corporate entities and partnerships

—in excess of hundreds of proposed transactions involving the evaluation of covenant waivers and their pricing; consent solicitations and waivers of preemptive investment rights

—the sales of illiquid assets

—the exercise of options and registration rights; exercise of put options

—the exchange offer proposals and auctions of securities

—the restructuring of securities

—tender offers, right and warrant transactions

—sales of mortgage loans

—exchanges of securities in both troubled and private enterprises

—pre-packaged Chapter 11 consents

—acceptable pricing for all securities sold and call options on Drexel securities

—and establish criteria to allow Drexel discretion to sell securities ·

—refinancing

—consents to imposition of liens

—the unwinding of arbitrage's positions

be in accord with § 330.

---

**14.** "Zero based" means no cap in any month on services rendered, and that compensation will

—the identification of securities to sell to meet paydown schedules of First Drexel Burnham Lambert bank group

*See* affidavit of W.L. Ross page 2–3.

The range of review and understanding of this investment advisor is, to say the least, complex. The effort expended in the evaluation of this complex debtor to assist its constituent committee, is great. Their services have benefitted the estate so far, but we have a problem evaluating the worth of their services. According to Rothschild, there are at least twenty-five investment banking firms with reputable national practices providing financial advisory services in restructurings, workouts and bankruptcy cases, which has resulted in an open and highly competitive market (*see* W.L. Ross' affidavit, page 15), a fact that we think is belied by the evidence Rothschild provided.

Like Goldin, we had previously placed Rothschild on a "zero based" retention agreement. Like Goldin, we don't think a regular monthly retainer is appropriate at this stage of this case. We direct Rothschild, if it desires to be further retained in this case to submit a retention application in accord with this memorandum.

The debtor is to settle an order in accord with this memorandum.

## APPENDIX

*Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases* [1]

The following guidelines apply in all bankruptcy cases in the Southern District of New York. They delineate information that each interim and final application for professional fees and expenses must contain, and guidelines for reimbursement of disbursements. Those provisions preceded by an asterisk (*) are mandatory guidelines to which an applicant must certify the application adheres. No deviation from those guidelines marked with an asterisk is permissible, regardless of circumstances. Fee applications must comply with the remainder of these guidelines, provided that if the fee application departs therefrom (a) the certification shall specifically so state, and (b) the application must explain why the applicant believes departure from the guidelines is justified in the circumstances. The presumption is that the Court will follow the guidelines set forth herein. Any application departing from these guidelines shall include, in the paragraph proffering the justification for departing from the guidelines, the amount that the applicant would be entitled to receive under the guidelines.

### A. *Certification*

[*]1. Each application for fees and disbursements must contain a certification by the professional designated by the applicant with the responsibility in the particular case for compliance with these guidelines (the Certifying Professional), that (a) the Certifying Professional has read the application; (b) to the best of the Certifying Professional's knowledge, information and belief formed after reasonable inquiry, the application complies with the mandatory guidelines set forth herein; (c) to the best of the Certifying Professional's knowledge, information and belief formed after reasonable inquiry, the fees and disbursements sought fall within these guidelines, except as specifically noted in the certification and described in the fee application; and (d) except to the extent that fees or disbursements are prohibited by these guidelines, the fees and disbursements sought are billed at rates and in accordance with practices customarily employed by the applicant and generally accepted by applicant's clients.

[*]2. Each application for fees and disbursements must contain a certification by either the Certifying Professional or by the trustee, the debtor, or the chair of each official committee represented by the applicant that the trustee, the debtor, or the chair of each official committee (as to each

1. These guidelines shall apply to all professionals seeking compensation pursuant to 11 U.S.C. §§ 327, 328, 330 and 331, including investment bankers and real estate advisors, unless the Court, in the order of retention, provides otherwise.

respective committee's professionals) has reviewed the fee application and has approved it. If the Certifying Professional is unable to certify that the trustee, debtor or committee chair, as the case may be, has approved the application, then the application must so state.

[*]3. Each application for fees and disbursements must contain a certification by the Certifying Professional that the trustee, the chair of each official committee and the debtor have all been provided no later than 20 days after the end of each month with a statement of fees and disbursements accrued during such month. The statement must contain a list of professionals and paraprofessionals providing services, their respective billing rates, the aggregate hours spent by each professional and paraprofessional, a general description of services rendered, a reasonably detailed breakdown of the disbursements incurred and an explanation of billing practices.

[*]4. Each application for fees and disbursements must contain a certification by the Certifying Professional that the trustee, the chair of each official committee and the debtor have all been provided with a copy of the relevant fee application at least 10 days before the date set by the Court or any applicable rules for filing fee applications.

[*]5. The Certifying Professional and, where applicable, the trustee, the debtor, or the chair of each official committee providing a certification should be present at the hearing unless previously excused by the Court.

B. *Time Records Required to Support Fee Applications*

[*]1. Each professional and paraprofessional must record time in increments of tenths of an hour, and must keep contemporaneous time records on a daily basis.

[*]2. Time records must set forth in reasonable detail an appropriate narrative description of the services rendered. Without limiting the foregoing, the description should include indications of the participants in, as well as the scope, identification and purpose of the activity that is reasonable in the circumstances, especially in relation to the hours sought to be charged to the estate for that particular activity [2].

[*]3. In recording time, each professional and paraprofessional may describe in one entry the nature of the services rendered during that day and the aggregate time expended for that day without delineating the actual time spent on each discrete activity, *provided, however,* that if the professional or paraprofessional expends more than 1 hour on a particular activity the time record for that day must include, internally in the description of services for that day, the amount of time spent on that activity. A hypothetical time record complying with this guideline is included in the margin.[3]

[*]4. To the extent a professional is engaged in rendering services in a discrete activity within the case (a) that can reasonably be expected to continue over a period of at least three months, and (b) that can reasonably be expected to constitute approximately 10–20% or more of the fees to be sought for an interim period, the professional shall establish a separate record entry for that matter, and record time therein

---

2. By way of illustration only, and not by way of limitation, the following descriptions are inadequate or incomplete:

(i)    J. SMITH—1/10/91—legal research re fraudulent transfers—10.0

(ii)   J. SMITH—1/11/91—lengthy telephone call with J. Doe re status—.7

(iii)  J. SMITH—1/12/91—drafting motion papers—5.0

(iv)   J. SMITH—1/13/91—interoffice conferences w/J. Doe and P. Jones re direction of of case—2.0

(v)    J. SMITH—1/14/91—meeting with creditors—8.0

(vi)   J. SMITH—1/14/91—document organization—3.0

(vii)  J. SMITH—1/15/91—various correspondence—1.0"

3. A complying time entry would be:

["Conf. W/X re 362 hearing; revising draft motion re ordinary course [1.1]; numerous TCs re adeq. protection; conf. call W/Y, Z re taxes [1.4]; review court filings ... Total Time 3.8"]

separate from any other services in the case. Within that separate entry the professional shall comply with Section B(3), including the *proviso* thereof. Examples of such discrete services within a case where such separate recording may be appropriate, in a particular case, include: an extended program of Rule 2004 examinations; sale of a significant asset or subsidiary; a significant adversary proceeding or contested matter; negotiating a plan; drafting and commenting on plan documents (plan, disclosure statement, related corporate documents, etc.) . . .

Paraprofessionals working on such a discrete activity shall similarly account separately for their services and time.

5. The Court may direct, in the order scheduling the hearing on fees or otherwise, the fee applicant to make available to parties in interest, or to file with the Clerk of the Court, a copy of the contemporaneous time records required to be kept by Sections B(1)–(4). If the Court so directs, the Court shall provide that time record entries referring to or disclosing privileged material and confidential material may be excised from such records; provided, however, that if the excised material is sufficiently extensive to infringe upon the Court's ability to judge reasonableness of the services, the Court may request submission of *in camera,* unredacted time records.

C. *Description of Services Rendered*

1. *Content of the Application.* In addition to the description of services rendered to the trustee, the debtor or an official committee, as the case may be, each fee application must include:

[*](a) A statement at the outset thereof of(i) the amount of fees and disbursements sought; (ii) the time period covered by the application; and (iii) unless the order authorizing retention dispenses with this subparagraph, the total professional hours expended, as well as the total paraprofessional hours expended.

[*](b) Unless the order authorizing retention upon application therefor dispenses

with this paragraph, a schedule showing the name of each professional, with his or her position in the firm, the name of each paraprofessional who worked on the case during the fee period, the year that the professional was licensed to practice, the hours worked by each professional and paraprofessional, and the hourly rate for each professional and paraprofessional. Any change in hourly rates or billing practices from those utilized in the prior application period must be noted on the schedule.

2. To the extent an applicant is required by Section B(4) hereof to maintain a separate time record, the fee application shall describe in reasonable detail the nature of that discrete activity as well as the results of the applicant's efforts. The description shall include an approximation of the percentage of the total fee requested in the application attributable to such activity.

[*]3. Any request for an enhancement of fees over the fee which would be consistent with Section A(1)(d) hereof or which would be derived solely from applicable hourly rates must be specifically identified in the application, and the justification for the requested enhancement must be set forth in detail.

D. *Reimbursement for Expenses and Services*

1. *Certification*

Each application requesting reimbursement for services and expenses must contain a certification by the Certifying Professional that:

[*]a. In providing a reimbursable service, the applicant does not make a profit on that service.

b. In charging for a particular service, the applicant does not include in the amount for which reimbursement is sought the amortization of the cost of any investment, equipment, or capital outlay.

[*]c. In seeking reimbursement for a service which the applicant justifiably purchased or contracted for from a third party (such as temporary paralegal or secretary services, or messenger ser-

**32**

vice), the applicant requests reimbursement only for the amount billed to the applicant by the third-party vendor and paid by the applicant to such vendor.

2. *Presentation of Disbursements and Expenses in Fee Application.*

[*]a. In requesting reimbursement for expenses and services, applicants are specifically reminded of other certifications required by these guidelines, and in particular the certification under Section A(1)(c) hereof. Excessive charges shall not be reimbursed. To the extent that an applicant seeks reimbursement for expenses and services, the application shall categorize them (if applicable) in the following manner:

   (i)   Photocopying
     a.  Internal (see D(3))
     b.  External (see D(1)(c))
   (ii)  Telecommunications
     a.  Toll charges (see D(6))
     b.  Facsimile (see D(1)(c))
   (iii) Courier and freight (see D(6))
   (iv)  Printing (see D(1)(a))
   (v)   Court reporter and transcripts
   (vi)  Messenger service (see D(1)(c))
   (vii) Computerized research (see D(4))
   (viii) Out of town travel expenses (see D(7))
     a.  Transportation
     b.  Lodging
     c.  Meals
   (ix)  Word Processing, Secretarial and other Staff Services (see D(1)(b) and D(11))
   (x)   Overtime expense (see D(9))
     a.  Non-professional
     b.  Professional
   (xi)  Local Meals (see D(10))
   (xii) Local Transportation (see D(12))

Expenses and disbursements which do not fall within any of the foregoing categories and which exceed $500 in the aggregate should be listed separately and adequately described.

b. Support for each item for which reimbursement is sought must be kept. Such support shall be provided on request to the Court and the United States Trustee, and in appropriate circumstances to any party in interest provided that, where applicable, privilege or confidentiality can be preserved.

3. *Photocopying.*

Photocopying shall be reimbursable at the lesser of $.20 per page or cost.

4. *Computerized research.*

Computerized legal services such as Lexis and Westlaw are reimbursable to the extent of the invoiced cost from the vendor.

5. *Facsimile transmission.*

A charge for out-going facsimile transmission to long distance telephone numbers is reimbursable at the lower of (a) toll charges or (b) if such amount is not readily determinable, $1.25 per page for domestic and $2.50 per page for international transmissions. Charges for in-coming facsimiles are not reimbursable.

6. *Postage, telephone, courier and freight.*

The cost of postage, freight, overnight delivery, courier services, and telephone toll charges are reimbursable, if reasonably incurred. Thus, charges should be minimized whenever possible. For example, messengers and overnight mail should be used only when first-class mail is impracticable. Delivery of papers to professionals at their homes or similar locales by radio car or taxi is not reimbursable. Charges for local telephone exchange service are not reimbursable.

7. *Travel charges.*

First class air fare, luxury accommodations and deluxe meals are not reimbursable, nor are personal, incidental charges such as telephone and laundry unless necessary as a result of an unforeseen extended stay. Mileage charges for out-of-town travel with one's own car are reimbursable at the lesser of the amount charged clients in the non-bankruptcy context or the amount allowed by the Internal Revenue Service for per mile deductions.

[*]8. *Proofreading.*

Charges for proofreading for typographical or similar errors are not reimbursable whether the services are performed by a paralegal, secretary or temporary staff.

9. *Overtime expense.*

Overtime for non-professional and para-professional staff is not reimbursable unless justified under the first paragraph of these guidelines. Any such justification must indicate, at a minimum, that (i) services after normal closing hours are absolutely necessary for the case, and (ii) the charges are for overtime expenses paid. The reasonable expenses of a professional required to work on the case after 8:00 p.m. are reimbursable *provided* that, if the professional dines before 8:00 p.m., the expense is reimbursable only if the professional returns to the office to work for at least 1½ hours. In any event, the expense for an individual's meal may not exceed $20.00.

10. *Daytime meals.*

Daytime meals are not reimbursable unless the individual is participating, during the meal, in a necessary meeting respecting the case.

11. *Word processing, secretarial and other staff services*

Daytime, ordinary business hour charges for secretarial, library, word processing and other staff services (exclusive of para-professional services) are not reimbursable unless such charges are not included in the firm's overhead for the purpose of setting billing rates, in which case the application shall so state. Special office charges, such as the temporary employment of additional staff: a) necessitated by the case and b) not incurred in replacement of permanent staff or to shift otherwise nonreimbursable charges, will be reimbursed if reasonable and justified in each instance.

12. *Local transportation.*

Local taxi and limousine charges should be minimized and justified. Because of the proximity of mass transit to the court, mass transit should be used whenever practicable.