ELECTRONIC CITATION: 2003 FED App. 0001P (6th Cir.)
File Name: 03b0001p.06

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | |
|---|---|
| In re: AIRSPECT AIR, INC., | ) |
| | ) |
| Debtor. | ) |
| _____ | ) |
| | ) |
| JEFFREY L. NISCHWITZ, TIMOTHY L. | ) |
| McGARRY and CHRISZT McGARRY | ) |
| CO. L.P.A. (f/k/a NISCHWITZ, PEMBRIDGE | ) |
| & CHRISZT CO. L.P.A.), | ) |
| | ) |
| Appellants, | ) |
| | ) |
| v. | )   No. 02-8022 |
| | ) |
| AIRSPECT AIR, INC., | ) |
| | ) |
| Appellee. | ) |
| _____ | ) |

Appeal from the United States Bankruptcy Court
for the Northern District of Ohio, Eastern Division at Akron.
No. 96-50540.

Argued: November 6, 2002

Decided and Filed: February 6, 2003

Before: AUG, COOK, and HOWARD, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

**ARGUED:** Timothy L. McGarry, CHRISZT McGARRY COMPANY, Cleveland, Ohio, for Appellants. Daniel McGowan, Wadsworth, Ohio, for Appellee. **ON BRIEF:** Timothy L. McGarry, CHRISZT McGARRY COMPANY, Cleveland, Ohio, for Appellants. Daniel McGowan, Wadsworth, Ohio, for Appellee.



## OPINION

_____

J. VINCENT AUG, JR., Bankruptcy Appellate Panel Judge.  Appellants, Jeffrey L. Nischwitz, Timothy L. McGarry and Chriszt McGarry Co. L.P.A. (f/k/a) Nischwitz, Pembridge & Chriszt, Co. (collectively "CMC"),[1] were appointed as special counsel to represent the Debtor, Airspect Air, Inc. ("Airspect") in an adversary action against the City of Akron.  In this matter, CMC appeals the bankruptcy court's order of March 29, 2002, reducing, for the second time, CMC's fees from $189,750 to $37,050.  Because we believe that the bankruptcy court's finding of improvidence under 11 U.S.C. § 328 was clearly erroneous and its reduction of CMC's fees was an abuse of discretion, we **REVERSE** and **REMAND** with instructions to award CMC fees of $189,750.

## I.   ISSUE ON APPEAL

The central issue in this case is whether the bankruptcy court erred in its finding that the terms and conditions of the contingent fee contract between Airspect and CMC, as approved by the bankruptcy court,  were improvident in light of  events that could not  have been predicted at the time the contract was approved.

## II.   JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over appeals from the final orders of bankruptcy courts in the Northern District of Ohio because that district has authorized appeals to this Panel.  The final orders of a bankruptcy court are appealable orders.  28 U.S.C. § 158(a)(1).

_____

[1] At the time Jeffrey L. Nischwitz began representing Airspect, he was practicing as a sole practitioner.  Shortly thereafter, he participated in the formation of the law firm of DiLeone, Nischwitz, Pembridge & Chriszt Co., L.P.A., which later changed its name to Nischwitz, Pembridge & Chriszt Co., L.P.A.  The law firm of Nischwitz, Pembridge & Chriszt Co., L.P.A. changed its name to Chriszt McGarry Co., L.P.A. on January 1, 2002.  These predecessor firms along with CMC will generally be referred to collectively as "CMC."  When necessary, Jeffrey L. Nischwitz will be referred to individually as "Nischwitz."

Orders awarding or denying the award of attorney fees are reviewed for abuse of discretion. *Mapother & Mapother, P.S.C. v. Cooper (In re Downs),* 103 F.3d 472, 480 (6th Cir. 1996); *Michel v. Federated Dep't Stores, Inc. (In re Federated Dep't Stores, Inc.),* 44 F.3d 1310, 1315 (6th Cir. 1995). A bankruptcy court abuses its discretion when it "relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Fleischut v. Nixon Detroit Diesel, Inc.,* 859 F.2d 26, 30 (6th Cir. 1988).

### III.  FACTS

*Underlying Facts of the Case*

Prior to 1993, Airspect entered into a long-term lease with the City of Akron to operate a "fixed-base operation" at the Akron-Fulton International Airport. In compliance with the lease, Airspect constructed a 28,500 square foot building, hangar, ramp, and fuel farm (collectively the "Improvements"). Various disputes quickly arose between the City and Airspect over certain terms of the lease and Airspect began withholding payments from the City. At that time, the lease had approximately 28 years remaining before its termination.

Beginning in January 1993, Airspect became involved in litigation with the City over the terms of the lease. The litigation was finally settled over six and a half years later on July 22, 1999, and the City paid Airspect $575,000 in exchange for Airspect vacating the leased premises and relinquishing all rights in the Improvements. The route to this settlement, however, was contentious and a summary of the string of lawsuits and events follows:

A.    In January 1993, Airspect filed a declaratory judgment action against the City in the Court of Common Pleas of Summit County, Ohio. The City counterclaimed for breach of contract and sought to evict Airspect and recover the Improvements made on the property. In its pleadings, the City asserted that it had, by appropriate notice, terminated the lease with Airspect on December 22, 1992. Thereupon, Airspect amended its complaint to add breach of contract, misrepresentation, and constructive eviction. In

3

its prayer for relief Airspect sought damages and rescission. This proceeding was later dismissed without prejudice.

B.  In June 1994, the 1993 action was refiled. After various pretrial motions were resolved, the matter was set for trial in March 1996 with each party having a breach of contract claim remaining against the other. Airspect prayed for relief in the amount of $10 million in compensatory damages plus rescission of its lease agreement with the City. According to its counsel, Airspect had claims for lost profits, the value of the Improvements, and future lost profits.

C.  In December 1995, Airspect, in need of new counsel, requested Jeffrey L. Nischwitz to represent it in the state court action.[2] When Nischwitz was unable to obtain a continuation of the state court trial date set for March 1996, he suggested that Airspect file bankruptcy to give Nischwitz time to properly prepare for the state court trial.

D.  On March 13, 1996, with the assistance of Mary Ann Rabin as its bankruptcy counsel, Airspect filed its voluntary Chapter 11 petition, thereby effectively staying the state court action.

E.  The pending state court action between Airspect and the City was transferred to the bankruptcy court and became an adversary proceeding.

F.  On May 3, 1996, Airspect filed a motion with the bankruptcy court seeking to employ CMC as special counsel to litigate the adversary proceeding. The fee agreement between CMC and Airspect was not attached to the motion for employment. Nevertheless, the bankruptcy court approved the motion which stated the terms of employment and the fee arrangement upon which CMC was willing to represent Airspect, as follows:

> Fees, other than expenses, are to be paid on a contingency basis and are subject to approval by this court. The fee arrangement states 33% if settled at least two weeks before trial; 40% if within two weeks of trial or, after commencement of trial; 50% if post-trial or re-trial.

---

[2]During the time frame the litigation between Airspect and the City was pending, Airspect was represented by nine different counsel, including CMC.

G.     On May 20, 1996, the bankruptcy court entered its order approving CMC as special counsel to represent Airspect in the adversary proceeding.  The order provided:

> Upon Motion of the Debtor, Debtor-in-Possession, for authority to employ special counsel to represent it in the case relating to the Complaint for Declaratory Judgment pending in the Court of Common Pleas of Summit County, Ohio, being Case No. CV94061978.
>
> The Court being satisfied that Jeffrey L. Nichwitz [sic] and his law firm . . . and Timothy L. McGarry, a sole practitioner, represent no adverse interest to Airspect Air, Inc. in the matters upon which they are to be engaged, and that their employment is necessary and would be in the best interest of the estate.
>
> IT IS ORDERED that Debtor, Debtor-in-Possession, in the above-captioned proceedings be and hereby is authorized to employ Jeffrey L. Nichwitz and his law firm . . . and Timothy L. McGarry, a sole practitioner, to represent it as Special Counsel in the Chapter 11 proceedings to assist in representation of the Debtor, Debtor-in-Possession.
>
> IT IS FURTHER ORDERED that Airspect is authorized to pay the sum of $7,000.00 of corporate funds as partial retainer for expenses.
>
> IT IS FURTHER ORDERED that Nichwitz and McGarry submit application for fees to this Court for approval.

H.     Subsequent to the filing of its bankruptcy petition, Airspect failed to assume or reject the lease between the City and Airspect that was the subject of the adversary proceeding.   The City filed a motion for a determination that the lease was rejected and also requested relief from stay.  At a hearing held September 6, 1996, the bankruptcy court found that the lease had been rejected by operation of 11 U.S.C. § 365(d)(4).  The bankruptcy court stated, however, that, although rejected, the lease was not terminated. Noting the substantial unencumbered Improvements made by Airspect on the leased premises, the bankruptcy court stated that Airspect had significant equity in the assets and the bankruptcy court was unwilling to grant the City relief from stay that might result in a forfeiture of the Improvements.  Consequently, by order entered on September 11, 1996,

5

the court denied the City's motion for relief from the stay and allowed Airspect to remain in possession of the property so long as Airspect paid the City all postpetition expenses, including rent and flowage fees.

I.      On September 23, 1996, the City appealed the denial of relief from stay to the district court.  By order entered almost two years later, on July 9, 1998, the denial of the relief from stay was reversed by the district court.  Although the district court found that the City was entitled to immediate possession of the leased premises, it did not directly address whether Airspect still had rights in the Improvements.  Rather, the district court simply held that Airspect's rejection of the lease meant that the City was entitled to immediate possession of the leased premises pursuant to the plain language of 11 U.S.C. § 365(d)(4).  The district court noted that rejection of a lease and termination of a lease are different concepts, but it did not elaborate on how those different concepts might affect the rights of the parties in the Improvements made to the leased premises.  Both parties appealed the decision of the district court to the United States Court of Appeals for the Sixth Circuit.

J.      With respect to the pending adversary proceeding, Airspect, on advice of CMC, took the position that the automatic rejection of the lease had no significant effect on Airspect's position in the litigation with the City because Airspect continued to have an interest in the Improvements.  As noted above, neither the decision of the bankruptcy court nor the district court gave Airspect any reason to believe that it did not have an interest in the Improvements after the lease was rejected.

K.      On motion filed by Airspect, the reference to the bankruptcy court was withdrawn and in September 1997, the adversary proceeding was transferred to the United States District Court for the Northern District of Ohio.  Mediation was attempted several times, deadlines were extended several times, and the trial date was continued several times.  A trial date was finally set for August 1999, and the district court refused to further extend that date upon request by the parties.

L.      Sometime in December 1998, Spasoje Miskovic, the sole shareholder and principal of Airspect, retained Daniel McGown as his personal counsel and requested that McGown intercede in the negotiations with the City.  In July 1999, Airspect filed a motion

in the bankruptcy court seeking authority to settle its dispute with the City. The settlement provided for either (i) the sale of Airspect's assets to a new fixed base operator found by Airspect, or (ii) if the City chose not to accept the new operator, then the City would pay Airspect the sum of $575,000 and Airspect would immediately surrender the leased premises and Improvements. The City chose the second option and Airspect received the $575,000 according to the agreement. The settlement also included the voluntary joint dismissal of the adversary proceeding and the appeals pending in the Sixth Circuit.

On February 3, 2000, CMC filed an Application of Special Counsel for Debtor and Debtor-In-Possession for Payment of Attorneys' Fees in the amount of $189,750, or one-third of $575,000.[3] Miskovic filed an objection to the Application for Fees.

*Procedural History of Application for Fees*

The dispute over fees in this case is not new to us. In its first decision regarding CMC's fees, the bankruptcy court held that the contingency provision in the fee agreement was inoperative because the contingency had not been met and so the fee had not been earned. Having reached this conclusion, the bankruptcy court turned to an evaluation of CMC's fees under 11 U.S.C. § 330 and awarded "reasonable" fees of only $37,050.

CMC appealed that decision and this Panel found that the bankruptcy court had erred in determining that the contingency set out in the fee agreement had not been met. The Panel reversed and remanded the case to the bankruptcy court with instructions for it to review the fee application under 11 U.S.C. § 328 rather than § 330 and to award the appropriate contingent fee unless it determined that its initial approval of the fee arrangement was improvident in light of subsequent events.

On remand the bankruptcy court has now determined that its approval of the contingent fee was improvident in light of subsequent events. Accordingly it applied the provisions of § 330 and again arrived at a reasonable fee of $37,050. CMC brought this timely appeal.

---

[3]CMC provided time sheets reflecting 1,329.29 hours of time from January 5, 1996 to August 23, 1999. Nischwitz states that calculated at his 1996 hourly rate of $150, fees due to CMC would total $199,394 rather than $189,750.

7

## IV. DISCUSSION

### A.

In refusing to award CMC its contingent fee under 11 U.S.C. § 328, the bankruptcy court relied on the statutory exception within § 328 which provides that the terms and conditions of a previously-approved fee application may be disregarded if they "prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a). The bankruptcy court found its action in approving the contingent fee contract was improvident because it had not known at that time of Airspect's deemed rejection of the lease under 11 U.S.C. § 365(d)(4). The court stated:

> Had such a fact been comprehended, the need for debtor to retain special litigation counsel on a contingency basis to prosecute the only then remaining claim in the Adversary Proceeding (breach of contract) would not have been as great because, at that point, debtor had, as a matter of law, been deemed to have breached that contract. Accordingly, this Court is empowered by § 328 of the Bankruptcy Code to disregard the contingency fee agreement between [Nischwitz] and Airspect.

Based on this finding, the bankruptcy court awarded CMC compensation for its services through September 9, 1996, the lease rejection date, at Nischwitz's hourly rate of $150 per hour. This lodestar formula, grounded in § 330, resulted in an attorney fee award of $37,050. If the award had been made pursuant to § 328, CMC would have received a contingent fee of $189,750.

The widely accepted general rule is that bankruptcy courts, once having approved employment under § 328, may not later switch to § 330 to award fees. "Cases which have considered . . . § 328(a) have not allowed bankruptcy courts to later reduce previously approved contingency fees based upon the usual tests for reasonable compensation." *In re Olympic Marine Servs., Inc.*, 186 B.R. 651, 654 (Bankr. E.D. Va. 1995); *see also Pitrat v. Reimers (In re Reimers)*, 972 F.2d 1127 (9th Cir. 1992) (reversing bankruptcy court's reduction of fees due under pre-approved contingency fee agreement and remanding for findings under § 328(a)); *In re Merry-Go-Round Enters., Inc.*, 244 B.R. 327 (Bankr. D. Md.

9

2000) (approving fee of $71.2 million pursuant to a 40% contingency fee agreement previously approved by the bankruptcy court due to extreme risks assumed by counsel). In *In re Merry-Go-Round*, the bankruptcy court considered § 328(a), determined that prior approval of the fee agreement was not improvident based on the circumstances of that case and noted the "important policy consideration for honoring fee agreements with professionals." *Id*. at 337 (citing *Donaldson Lufkin & Jenrette Secs. Corp. v. Nat'l Gypsum Co.* (*In the Matter of Nat'l Gypsum Co.*), 123 F.3d 861 (5th Cir. 1997)). As one court has put it:

> Section 330, by its own terms, is "subject to" § 328. Thus, § 328 must apply when the court approves a fee arrangement prior to services being rendered. Section 328 and 330 also work in tandem. In cases where the court has pre-approved the terms of employment, upon request for compensation, § 330(a) provides the framework for review while § 328 provides the standard for review.
>
> The standard for review in § 328 cases is that of improvidence "in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a). It is not the reasonableness standard as provided in § 330. Section 330(a)'s reasonableness standard does not supplant § 328(a) and give the judge free reign to void a previously authorized employment agreement for a percentage fee. The reasonableness standard applies when the court approves the appointment of a professional, but does not approve the terms of employment.
>
> If the bankruptcy court pre-approves the terms of the appointment, it does not have the power to make a "reasonableness" review.

*In re Westbrooks*, 202 B.R. 520, 522-23 (Bankr. N.D. Ala. 1996) (citations omitted).

Under § 328, an intervening circumstance, in order to render improvident a court's decision to grant a fee application, must be one that would have affected the court's decision in the first place. It must have been relevant to that decision in some way, rendering it untenable or unwise in hindsight. The intervening circumstance in this case–the only one identified by the bankruptcy court–was the deemed rejection of the

lease by operation of § 365(d)(4). But that event is irrelevant to what CMC was doing in pursuit of the lawsuit against the City, because the damages that CMC had been retained to recover were actionable whether the lease was terminated or not. This is made clear by the Restatement (Second) of Property, which itemizes the damages available to a tenant under a lease.

> If the tenant is entitled to recover damages from the landlord for his failure to fulfill his obligations under the lease, absent a valid agreement as to the measure of damages, damages may include one or more of the following items as may be appropriate so long as no double recovery is involved:
>
> (1) if the tenant is entitled to terminate the lease and does so, the fair market value of the lease on the date he terminates the lease;
>
> (2) *the loss sustained by the tenant due to reasonable expenditures made by the tenant before the landlord's default which the landlord at the time the lease was made could reasonably have foreseen would be made by the tenant;*
>
> (3) if the tenant is entitled to terminate the lease and does so, reasonable relocation costs;
>
> (4) if the lease is not terminated, reasonable additional costs of substituted premises incurred by the tenant as a result of the landlord's default while the default continues;
>
> (5) if the use of the leased property contemplated by the parties is for business purposes, loss of anticipated business profits proven to a reasonable degree of certainty, which resulted from the landlord's default, and which the landlord at the time the lease was made could reasonably have foreseen would be caused by the default;
>
> (6) if the tenant eliminates the default, the reasonable costs incurred by the tenant in eliminating the default; and
>
> (7) interest on the amount recovered at the legal rate for the period appropriate under the circumstances.

Restatement (Second) of Property: Landlord and Tenant § 10.2 (1976) (emphasis added). The American Law Institute's comment to this section specifically states that "[t]he tenant's

11

right to damages for the landlord's default does not turn on whether the tenant elects to terminate the lease as a result of the default." *Id.*, cmt. a (1976).

Section 7.1 of the Restatement further makes it clear that the tenant may recover damages whether he terminates the lease or not.

> Except to the extent the parties to a lease validly agree otherwise, if the landlord fails to perform a valid promise contained in the lease to do, or to refrain from doing, something on the leased property or elsewhere, and as a consequence thereof, the tenant is deprived of a significant inducement to the making of the lease, and if the landlord does not perform his promise within a reasonable period of time after being requested to do so, the tenant may:
>
> (1) terminate the lease in the manner prescribed in § 10.1 and recover damages to the extent prescribed in § 10.2; or
>
> (2) *continue the lease* and obtain appropriate equitable and legal relief, including:
>
> (a) the recovery of damages to the extent prescribed in § 10.2. . . .

Restatement (Second) Property: Landlord and Tenant § 7.1 (1976) (emphasis added).

These uncontroversial provisions of the Restatement are well regarded in the Ohio courts, particularly § 10.2, which is often cited as the measure of damages available to a tenant under a ground lease. *Kostoglou v. Midkiff Enter., Inc.,* No. 01 C.A. 23, 2001 WL 1469161, at *7 (Ohio Ct. App. Nov. 6, 2001); *Vanderpool v. Waddell,* No. 1822, 1987 WL 19853, at *3 (Ohio Ct. App. Nov. 12, 1987);[4] 2044 *Euclid Partners v. Williamson,* No. 49963, 1986 WL 4386, at *4 (Ohio Ct. App. Apr. 10, 1986). The Ohio courts have applied other sections of the Restatement as well. *Springfield N.O. Nelson Co. v. Mapes,* No. 1712, 1983 WL 2422, at *3 (Ohio Ct. App. May 5, 1983) (applying Restatement (Second) of Property: Landlord and Tenant § 12.2 (1977)). Indeed, the reporter to the Restatement

---

[4]The *Vanderpool* court cites the Restatement (Second) of Property: Landlord and Tenant §§ 7.1, 102, and 11.1. The citation to § 102 is an error because the Restatement does not contain a § 102. Instead, the reference is to § 10.2, the section dealing with damages, the issue under consideration by the *Vanderpool* court.

believes that "[t]he rules of this section [§ 10.2] are generally consistent with the weight of authority." Restatement (Second) of Property: Landlord and Tenant § 10.2, Reporter's note 1 (1976).

It follows that Airspect, as tenant under a lease, was entitled to recover damages for any "loss sustained by the tenant due to reasonable expenditures made by the tenant before the landlord's default which the landlord at the time the lease was made could reasonably have foreseen would be made by the tenant." Restatement, § 10.2(2). This is true whether or not the lease was terminated before or after the damages accrued. What the bankruptcy court has overlooked in its discussion is that Airspect had sued its landlord to recover for damages *already accrued* by the time the initial state lawsuit was filed on January 22, 1993. That same lawsuit, with counterclaims and amendments, was pending as of the petition filing date on March 13, 1996, and became the adversary action in this case. According to the pleadings therein, the lawsuit sought to recover damages for the City's failure to develop the airport as it had promised in 1979 when the lease was executed. Thus, Airspect's claims for damages were mainly retrospective, looking backward in time to events or defalcations that had already occurred when the suit was filed. These damages were fully actionable whether the lease was terminated or not.[5] The breaches, if any, by the City, had already occurred, could be litigated, and a recovery could be had. The damages sought by Airspect were in no way contingent on an extant lease. The damages that special counsel had been employed to recover occurred years before the bankruptcy filing and were clearly actionable whether the tenant had terminated the lease, or the landlord had terminated the lease, or neither had. Damages were still potentially available, and CMC properly continued to pursue them to a successful settlement. The bankruptcy court's analysis of the improvidence issue is simply erroneous.

B.

Although the precise issue before us is whether the bankruptcy court erred in holding that its approval of CMC's contingent fee contract was improvident, the bankruptcy

_____

[5]Indeed, the City claims in its pleadings that *it* had terminated the lease by notice to Airspect on December 22, 1992.

court spent a considerable portion of its decision suggesting that it had never actually approved CMC's contingent fee employment under § 328 and that we were mistaken in so assuming on the first appeal of this case. Thus the bankruptcy court carried out our instructions on remand, though reluctantly.

It must be observed that this Panel had every reason to believe that the bankruptcy court had approved a contingent fee contract under § 328. Airspect did not suggest, much less argue, that CMC's employment on a contingency basis had not been approved under § 328. Indeed, the facts were, and are, that Airspect's motion to employ special counsel (retention application) explicitly stated the essential terms of the parties' agreement and specifically that fees were "to be paid on a contingency basis and are subject to approval by this court. The fee arrangement states 33% if settled at least two weeks before trial. . . ." Without requiring a copy of the fee agreement itself, the bankruptcy court granted Airspect's motion by order of May 20, 1996. Hence the bankruptcy court approved Airspect's motion that sought to employ special counsel on only one basis: contingent fee. Indeed, the bankruptcy court stated in its first opinion in this matter: "Pursuant to an *Order dated May 20, 1996*, Applicant was retained as special counsel, *on a contingency basis*, to represent D.I.P. in the Adversary Proceeding." (Appellant's App. doc. 13 at 4 (emphasis added).). The bankruptcy court further stated that "[b]ecause Applicant was retained in this case pursuant to a contingency fee agreement, the appropriate first step in assessing the award of professional fees is by reference to that agreement." (Appellant's App. doc. 13 at 10.)

It is apparent to us that the bankruptcy court is not now saying that it did not approve a contingency fee arrangement because it clearly did. What the court is saying is that it did not approve a contingency fee arrangement under § 328. The bankruptcy court cites Ninth Circuit authority for the proposition that, unless an attorney's retention application specifies employment under § 328, and unless the court specifically approves that application pursuant to § 328, the application can be reviewed under § 330 of the Code. The leading case in the Ninth Circuit is *Friedman Enterprises v. B.U.M. International, Inc. (In re B.U.M. International, Inc.),* 229 F.3d 824 (9th Cir. 2000). There the court held that an attorney's retention application could be reviewed under § 330, even though his

14

employment contract called for contingent fees, because neither the retention application nor the order granting it referred to either § 328 or § 330. The order also contained a proviso that "all fees and costs of [the] attorney are subject to Court approval." *Id.* at 826.

*Friedman*, however, contains a feature that distinguishes it from the case at bar. The unsecured creditors' committee and the U.S. Trustee objected to the retention application and obtained a hearing at which they specifically sought clarification of the bankruptcy court's intentions. They further directly requested that any order approving employment "provide a clear statement that the Court [could] review this engagement at the end of the process to determine the fees paid were reasonable and a *benefit to the estate*, and that said professional may be required to disgorge any unreasonable amounts." *Id.* (emphasis added). The bankruptcy court stated its conclusion that the law was indeed to that effect, thus indicating its intention to review any fee application under § 330, which requires reasonableness and benefit to the estate, considerations not pertinent to § 328. Under these circumstances, and quoting the colloquy at the retention hearing, the Ninth Circuit thought that the bankruptcy court had adequately reserved to itself, upon clear notice to all the parties, the right to review fees under § 330. Central to this conclusion was the factual record, particularly the hearing held on the retention application. The Ninth Circuit concluded:

> It is clear from the record that the bankruptcy court intended to reserve for itself more than simply an "improvident circumstances" review under 11 U.S.C. § 328. It intended to reserve the power to conduct an 11 U.S.C. § 330 "reasonableness and benefit to the estate" review.

*Id.* at 830. The expressed intention of the bankruptcy court was the critical factor in this decision.

*Friedman* was followed by *Circle K Corp. v. Houlihan, Lockey, Howard & Zukin, Inc. (In re Circle K Corp.),* 279 F.3d 669 (9th Cir. 2002) in which the court found that "because the retention application did not unambiguously specify that § 328 governed, § 330 review was appropriate." 279 F.3d at 673. Neither the application for employment nor the order authorizing it contained reference to either § 328 or § 330. In a brief opinion citing *Friedman*, the court simply concluded:

15

> In this Circuit, unless a professional is unambiguously employed pursuant to § 328, its professional fees will be reviewed for reasonableness under § 330. To *ensure* that § 328 governs the review of a professional's fees, a professional must invoke the section explicitly in the retention application.

*Id.* at 674 (emphasis added).

*Friedman* makes sense because, as the court explained, its rationale sprang from a peculiar record in which the bankruptcy court had made it clear that it would review fees for reasonableness and benefit to the estate. However, *Circle K* does little more than inaugurate a housekeeping rule for the Ninth Circuit, which, after *Circle K,* apparently requires the retention application to mention § 328 specifically, failing which the professional's fees will be awarded pursuant to § 330. *Friedman,* the authority relied on by the *Circle K* court and which the bankruptcy court suggests is persuasive in this case, did not go that far. Instead of inventing a blanket rule as *Circle K* does, *Friedman* looked to the whole record to discern what the *court* actually approved, not what the attorney requested.

Indeed, the reach of the *Circle K* rule seems excessive, considering that the Federal Rules of Bankruptcy Procedure require no such thing. The governing rule is Rule 2014(a), which reads as follows:

> (a) APPLICATION FOR AN ORDER OF EMPLOYMENT. An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327, § 1103, or § 1114 of the Code shall be made only on application of the trustee or committee. The application shall be filed and, unless the case is a chapter 9 municipality case, a copy of the application shall be transmitted by the applicant to the United States trustee. *The application shall state* the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, *any proposed arrangement for compensation,* and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied

> by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a) (emphasis added). The rule does not require the retention application to recite any particular Code section to be effective, merely requiring that the application state the proposed arrangement for compensation. In this connection, it is also interesting to note that none of the form applications for employment of professionals offered by Collier's treatise mention either § 328 or § 330. *See* 11 Collier on Bankruptcy pt. 12 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2002).

In addition to approving the Ninth Circuit's rule, the bankruptcy court placed great stress on the language in its retention order requiring CMC to "submit application for fees to this Court for approval." It also pointed out that the retention application contained a similar acknowledgment that the contingent fee to be paid was "subject to approval by this court," and these expressions were deemed by the bankruptcy court to have ceded it authority to review fees under § 330 despite the application that specified contingent fee employment.

Such pro forma recitation of a court's authority to control the payment of fees does not change an application for contingent fee employment into an application for § 330 employment. In *In re National Gypsum Co.,* 123 F.3d 861, the Fifth Circuit, reversing both the district and the bankruptcy courts, held that a bankruptcy court's order retaining "the right to consider and approve the reasonableness and amount of [counsel's] fees" did not give the court the right to review counsel's fee application under § 330 instead of § 328." *Id.* at 862. The court noted that the former Bankruptcy Act had not contained provisions for the employment of professionals under contingent fee contracts and that therefore many professionals had been unwilling to work for bankruptcy estates because they could not guarantee themselves adequate compensation. Of course, the Bankruptcy Code changed this with the addition of § 328, and the Fifth Circuit observed that

> [i]f the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they

17

will receive for their expertise and commitment. Courts must protect those agreements and expectations, once found to be acceptable.

*Id.* at 862-863. With this policy in mind, the Fifth Circuit held that language in a court's retention order purporting to reserve to itself the right to approve for reasonableness should not be construed as an attempt to undercut or condition its approval of a contingent fee contract.

By retaining "the right to consider and approve the reasonableness and amount of DLJ's fees on both an interim and final basis," the court merely recited its control of the compensation in the event of subsequent and unanticipated circumstances affecting the reasonableness of that agreed fee.

*Id.* at 863. In other words, it reserved only the statutory "improvidence" review under § 328. That kind of pro forma language in applications and retention orders, usually drafted by counsel, as was the case here, is nothing more than a curtsy to the court's statutory powers. It should not be misused by courts to take back with one hand what the other hand seemingly has given.

The Fifth Circuit's view is preferable to that of the Ninth Circuit because the Ninth Circuit's rule, as expressed in *Circle K*, assumes without any rationale that there is a default rule that fees must be awarded under § 330 unless § 328 is expressly typed into the retention application. Yet the two statutes are of equal dignity, each standing alone in the Bankruptcy Code. The provisions of § 328 are not exceptions to those in § 330. The Ninth Circuit's default rule has no basis in the Bankruptcy Code or the Rules. As such, it should be construed as a housekeeping rule peculiar to the Ninth Circuit, one which no court in this circuit has adopted.

The better procedure for resolving such questions as "What arrangement did the court approve?" is to review the record and determine objectively what the court did.[6] The

---

[6]This is exactly what the Ninth Circuit did in *Friedman*, 229 F.3d at 826, when it relied on conversations between the court and counsel at a hearing on counsel's retention application. Those conversations made it clear that the court would conduct a review of counsel's eventual fee application for reasonableness and benefit to the estate, key provisions of § 330, and so informed counsel that the court was indeed taking back whatever approval it may have given under § 328.

18

record in this case contains a retention application that could not be clearer in offering counsel's employment only on a contingent fee basis. If the bankruptcy court had wished to approve his employment on some other basis, it had the duty, in all fairness, to propose a different employment. Merely reciting in its order that obvious statutory requirements are in effect does not warn counsel that he is being employed on a basis other than the one he agreed to. Thus, where counsel clearly proposes a specific employment and the court wishes to change it, the court should clearly restate the different terms of employment. Otherwise, counsel may unwittingly work under conditions not acceptable to him. Merely saying, for example, "Granted, subject to review by the court," is not a sufficient restatement because it does not adequately warn.

## V. CONCLUSION

We hold that the bankruptcy court erred in concluding that CMC's contingent fee employment had been improvidently approved, and for this reason the case is **REVERSED** and **REMANDED** with instructions to award CMC fees of $189,750.