## In re HIGH VOLTAGE ENGINEERING CORPORATION, et al., Debtors.

### No. 04–11586–JNF.

United States Bankruptcy Court, D. Massachusetts.

April 12, 2004.

Emmanuel L. Argentieri, Parker, McCay & Criscuolo, Marlton, NJ, for NWL Transformers, Inc.

Paula R.C. Bachtell, Dept. of Justice, Boston, MA, for Eric K. Bradford, U.S. Trustee.

William P. Brady, Jr., Robert P. Fox, Nutter, McClennen & Fish, LLP, Boston, MA, for EJC Edgewater, LLC.

Cristopher M. Condon, Paul S. Samson, Riemer & Braunstein, LLP, Boston, MA, for American Landmark Partners, II.

Amanda D. Darwin, Nixon & Peabody, LLP, Boston, MA, for U.S. Bank National Association Corporate Trust Services.

Michael R. Enright, Robinson & Cole, LLP, Hartford, CT, for General Electric Company.

Steven A. Ginther, Missouri Dept. of Revenue, Jefferson City, MO, for Missouri Dept. of Revenue.

Jeff Hall, IOS Capital, Macon, GA, for IOS Capital, Inc.

Ian Hammel, McDermott, Will & Emery, Boston, MA, for Premium Assignment Corp.

Lee Harrington, Nixon Peabody, LLP, Boston, MA, for Washington Dept. of Transportation

Christian T. Haugsby, Christine D. Lynch, Douglas B. Rosner, Goulston and Storrs, PC, Boston, MA, Vivek Melwani, Fried, Frank, Harris, Shriver & Jacobson, New York City, for High Voltage Engineering Corp.

Dion W. Hayes, McGuire Woods LLP, Richmond, VA, for Siemens Energy & Automation, Inc.

Glenn Z. Hering, Gregory J. Jordan, Peter J. Schmidt, Rooks Pitts, Chicago, IL, for BHC Components, Ltd.

Neil Herskowitz, Riverside Contracting LLC, New York City, for Riverside Contracting LLC.

John F. Higgins, James Matthew Vaughn, Thomas A. Woolley, Porter & Hedges, LLP, Houston, TX, for Tesla Power & Automation.

Thomas L. Jacob, Air Products and Chemicals, Inc., Allentown, PA, for Air Products and Chemicals, Inc.

Matt A. Jarrell, Sherrard, German & Kelly, PC, Pittsburgh, PA, for M&T Credit Corp.

Gregory O. Kaden, Ropes & Gray, LLP, Boston, MA, for Ad Hoc Committee of Noteholders.

Eric M. Kay, Douglas Mannal, Michael J. Sage, Stroock, Stroock & Lavan, LLP, New York City, Christopher J. Panos, Craig and Macauley, PC, Boston, MA, for

**322**

U.S. Bank National Association as Indenture Trustee.

G. James Landon, Sabrina L. Streusand, Hughes & Luce, LLP, Austin, TX, for TECO–Westinghouse Motor Company.

James M. Liston, Bartlett, Hackett, Feinberg, PC, Boston. MA, for Citizens Bank of Massachusetts.

John M. McAuliffe, McAuliffe & Associates, PC, Newton, MA, for Antico Development Co., Division of Charlesbank Estates, Inc.

Charles A. Moster, Moster Wynne, PC, Austin, TX, for Evans East.

Steven Munson, Hendel & Collins, PC, Springfield, MA, for Toshiba International Corp.

Gregory A. Pearson, Buchanan Ingersoll, PC, Pittsburgh, PA, for Buchanan Ingersoll, PC.

Rhonda E. Rosenblum, Becket & Lee, Malvern, PA, for American Express Travel Related Services Co., Inc. Corp. Card.

Richard Rosenstein, Pepe & Hazard, LLP, Boston, MA, for Federal Express Corp.

Eric A. Schaffer, Reed, Smith, Shaw & McClay, Pittsburgh, PA, for Dollar Bank.

Stephanie Thomas, Pension Benefit Guaranty Corp., Washington, DC, for Pension Benefit Guaranty Corp.

S. James Wallace, Griffith, McCague & Wallace, PC, Pittsburgh, PA, for Duquesne Light Co.

## MEMORANDUM

JOAN N. FEENEY, Chief Judge.

## I. INTRODUCTION

The matters before the Court are the "Application pursuant to Sections 327 and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014 for an Order Authorizing Debtors to Retain and Employ Evercore Restructuring L.P. as Financial Advisors" (the "Application") and the Limited Objection to that Application filed by the United States Trustee. The Application was filed on March 2, 1004, one day after High Voltage Engineering Corporation and certain of its subsidiaries ("HVE" or "High Voltage," collectively, the Debtors") filed voluntary Chapter 11 petitions. The Court initially scheduled a hearing on the Application for March 11, 2004, but continued the hearing to March 29, 2004 to permit the parties to conduct a further review of the Application and the terms of the employment of Evercore Restructuring L.P. ("Evercore"). The United States Trustee filed his Limited Objection on March 25, 2004. At the conclusion of the hearing, at which counsel to the Official Committee of Unsecured Creditors (the "Committee") also raised concerns about the Application, the Court directed the parties to file briefs by April 5, 2004. The United States Trustee filed his brief on April 5, 2004. Later in the day, the parties, in a "Notice of Submission and Request for Entry of Assented to Order Pursuant to Sections 327 and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014 Authorizing the Debtors to Retain and Employ Evercore Restructuring L.P. as Financial Advisors," reported that the United States Trustee, the Committee, and the Debtors had agreed on a form of order which "would resolve the open issues regarding approval under section 328(a) of the Bankruptcy Code."

## II. BACKGROUND

In conjunction with their First Day Motions and Applications, set forth in the Motion of Debtors for Emergency Hearing on First Day Pleadings, the Debtors submitted the Declaration, signed under penalty of perjury, of Russell L. Shade, Jr. ("Shade"), the Chief Executive Officer of

High Voltage and its subsidiaries. In his Declaration, Shade represented that the Debtors and their related non-debtor subsidiaries are "a diversified group of industrial and technology based manufacturing businesses," comprised of two segments: the Industrial Power Control segment and the Advanced Surface Analysis segment.

The Industrial Power Control segment, which includes Robicon Corporation ("Robicon") and certain non-debtor foreign subsidiaries, produces high power conversion products, such as variable frequency drives, used to regulate electric power in electric utility power generation, oil and gas extraction and other industrial processes. According to Shade, for its fiscal year ended April 26, 2003, Robicon had net sales of approximately $120 million and Robicon is in the process of integrating its sales with those of ASI, a non-debtor subsidiary of HVE located in Milan, Italy, which had net sales for the fiscal year ended April 26, 2003 of approximately $180 million. Shade represented that Robicon presently has approximately $70 million in back orders and that ASI has executed a letter of intent for a $35 million contract with Exxon Mobil Corporation.

According to Shade, the other segment, the Advanced Surface Analysis segment, has two components, equipment sales and analytical services. Shade discussed two companies in this business segment. Evan Analytical Group, a division of High Voltage, provides analytical services to engineers and scientists in industrial markets through the use of ions, electrons and x-rays. It had net sales for the fiscal year ended April 26, 2003 of approximately $19 million. The other company in this segment discussed by Shade, High Voltage Engineering Europa, B.V., a non debtor subsidiary located in the Netherlands, had net sales for the fiscal year ended April 26, 2003 of $10 million. According to Shade, it is the leading designer and manufacturer of particle accelerator systems.

In his Declaration, Shade disclosed the capital structure of the Debtors. He described the capital structure as follows:

An important source of financing was a revolving credit facility pursuant to the Financing Agreement, dated November 30, 2000, as amended and restated from time to time (the "Pre–Petition Credit Agreement"), by and among HVE (and certain of its affiliates that were since sold or merged into HVE), as Borrowers, HIVEC [Hivec Holdings, Inc., Case No. 04–11597], as Guarantor, the financial institutions from time to time party thereto, as Lenders and Ableco Finance LLC as Collateral and Administrative Agent ("Ableco"). The Pre–Petition Credit Agreement provided for a revolving credit facility of $25 million. As of the Filing Date, there was approximately $15.7 million in aggregate principal amount of indebtedness and accrued and unpaid interest outstanding under the Pre–Petition Credit Agreement. . . .

On August 8, 1997, HVE, pursuant to that certain indenture (the "Indenture") with State Street Bank and Trust Company, as Trustee, issued $155 million of 10½ % Senior Notes due 2004. On December 22, 1999, HVE received the consent (the "Consent Solicitation") of the holders of the outstanding notes (collectively, the "Noteholders") for the waiver of, and amendment to, certain provisions of the Indenture. . . . The Senior Notes are secured only by pledges of certain intercompany notes issued by Robicon, Nicole [Nicole Corporation, Case No. 04–11603] and HIVEC in favor of HVE and stock of ASIRobicon, Ltd., a foreign subsidiary of Robicon and rank senior to any subordinated indebtedness and are subordinate to all existing and future secured indebtedness. The unsecured

deficiency of the claims of the holders of Senior Notes places them among the twenty largest unsecured creditors of HVE. . . .

Letitia Corporation ("Letitia"), a holding company incorporated in Delaware holds approximately 91.3% of HVE's outstanding common stock. The principals of Letitia are Clifford Press ("Press"), the current President and Chairman of the Board of HVE, and Laurence Levy, a former Vice President and former Chairman of the Board of HVE. In addition, John Hancock Financial Services, Inc. and Ross Hill each hold 50% of HVE's preferred stock issued and outstanding.

In his Declaration, Shade also described the events leading to the filing of the Debtors' bankruptcy petitions. He explained that HVE's operating performance declined due to weakness in its former Physical Electronics Unit of the Advanced Surface Analysis segment. Shade indicated that in response to its financial difficulties, HVE disposed of "certain non-core business assets," including Maxima Technologies, Inc. and its subsidiaries. After making payments on secured loans and receivables, as well as on receivable securitization financing, he stated that the sale of the assets generated "aggregate net cash after tax proceeds of approximately $90 million." Some of the proceeds were used in 2003 to reduce indebtedness under the Pre–Petition Credit Agreement, but the balance was "insufficient to (i) significantly reduce the Debtors' long term indebtedness, (ii) stem the continuing decline resulting from Physical Electronics' performance, or (iii) fund the working capital needs of HVE and its subsidiaries, including its non-debtor subsidiary ASI."

According to Shade, in August of 2003, the Debtors commenced discussions with an ad hoc committee of holders of the Senior Notes. HVE did not makes its August 15, 2003 semi-annual interest payment on the Senior Notes and is in default under the Indenture. HVE also did not make an interest payment due on February 15, 2004 to the Senior Noteholders, although Shade represented that "the Debtors and their advisors undertook a comprehensive search for additional equity and/or debt financing from numerous potential investors."

At the same time they were negotiating with the unofficial committee of Senior Noteholders, the Debtors were negotiating with Ableco, which had granted them three extensions of the October 31, 2003 maturity date of the Pre–Petition Credit Agreement. The final extension date was March 1, 2004, the date the Debtors filed their Chapter 11 petitions.

On February 18, 2004 (as amended and restated on February 27, 2004), HVE, Press and "holders of in excess of 54% of the Senior Notes" executed a Restructuring Agreement. According to Shade, the parties to the Restructuring Agreement contemplate the restructuring of the Debtors' capital structure "through a consensual, pre-arranged chapter 11 plan of reorganization." The Restructuring Agreement provided for the plan be filed no later than March 31, 2004, for the plan to be confirmed on or before the earlier of 90 days after the filing date of the plan or June 15, 2004, and for the plan to become effective on or before the earlier of 100 days after the filing date of the plan or June 25, 2004.

The Debtors met the March 31, 2004 deadline, having filed a Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization and a Joint Chapter 11 Plan of Reorganization on that day. Moreover, two days before that date, this Court entered a "Final Order (I) Authorizing Secured and Super–Priority Post–Petition Financing and Use of Cash Collateral

Pursuant to 11 U.S.C. §§ 363, 364, and 507(b), (II) Modifying Automatic Stay Under 11 U.S.C. § 362, and (III) Granting Other Related Relief" (the "Final Order"). In the Final Order, this Court authorized the Debtors to borrow from the Administrative Agent and Lenders[1] a total of up to $25,000,000 in principal pursuant to the New Credit Agreement and the Guarantee and Security Agreement dated February 27, 2004. In the Final Order, the Court found that, pursuant to an initial advance previously authorized in the sum of $21,000,000, the Debtors had repaid Ableco $15,649,333.29.

The Final Order contains a "Carve–Out" for, *inter alia,*" the fees and expenses of the professionals retained by the Debtors, the Committee, and any trustee, examiner, or other representative appointed in the Bankruptcy Cases, and the professionals retained by the Ad Hoc Committee which accrue any time prior to the Final Maturity Date, defined as the earlier of the consummation date of the Debtors' Plan of Reorganization or July 15, 2004 and "up to $700,000 (exclusive of retainers previously paid) in fees and expenses of the Professionals (of which, no more than $100,000 for the professionals retained by the Ad Hoc Committee) which accrue at any time after the Final Maturity Date or any accelerated maturity of the New Obligations (payment of such fees and expenses shall be subject to Bankruptcy Court approval)."

## III. THE DEBTORS' DISCLOSURE STATEMENT

In their Disclosure Statement, the Debtors indicate that they propose a Plan pursuant to which administrative expenses with be paid as follows:

to the extent allowed, in full, in Cash on, at the Reorganized Debtors' option, the later of (A) the Effective Date (or as soon thereafter as is practicable) or (b) such other date to which the Reorganized Debtors and the holder of the allowed Administrative Expense otherwise agree; *provided, however, . . .* (z) obligations incurred to Professionals for services provided prior to the Confirmation Date will be paid in accordance with Court order approving the fees and expenses of each such Professional; *provided, further, however,* that allowed Administrative Expenses incurred by the debtors or the Reorganized Debtors, as the case may be, after the Confirmation Date, including, without limitation, claims for Professionals' fees and expenses, will not be subject to application and may be paid by the Debtors or the Reorganized Debtors, as the case may be, in the ordinary course of business and without further Court approval.

Although the provisions set forth in the Disclosure Statement may conflict with the Final Order with respect to the Court's ability to review the compensation of professionals, the Debtors also contemplate that the Court will retain jurisdiction, after the Effective Date, "to determine any and all disputes relating to Administrative Expenses, Claims and Interests and the allowance and amount thereof," and "to determine the amount allowable as Administrative Expenses pursuant to Section 503(b) of the Bankruptcy Code." The Debtors also proposed to pay Priority Tax Claims in accordance with the provisions of the Bankruptcy Code.

The Debtors set forth nine classes of claims and interests in their Disclosure Statement and Plan, including Class 1: Priority Claims (other than Administrative Expenses) and Priority Tax Claims (Unim-

---

**1.** Among the Lenders are several holders of    the Senior Notes.

paired); Class 2: Miscellaneous Secured Claims (Unimpaired); Class 3: Pre–Petition Senior Note Claims (Impaired); Class 4: General Unsecured Claims (Impaired); Class 5: Intercompany Claims (Impaired); Class 6: Old Preferred Stock Interests (Impaired); Class 7: Old Common Stock Interests (Impaired); Class 8: Subsidiary Common Stock Interests (Unimpaired); Class 9: Other Interests (Impaired). Other than disclosing that the Pre–Petition Senior Note Claims total "approximately $172.8 million," the Debtors did not disclose the amount of the other claims and interests comprising the other eight classes, leaving a space for the appropriate amount to be inserted.

In their Disclosure Statement, the Debtors represent that they intend to extinguish the Pre–Petition Senior Note Claims on the Effective Date and distribute to each claimant its pro rata share of "the Senior Note Distribution," which the Debtors state will be determined by the ratio between the amount of such holder's Allowed Pre–Petition Senior Note Claim and the aggregate amount of all Allowed Pre–Petition Senior Note Claims. Elsewhere, the Debtors state that the Senior Noteholders will receive a pro rata share of 97% of the common stock of the Reorganized Debtors, subject to dilution by the issuance of options pursuant to the Management Incentive Plan and the warrants issued under the Plan.

According to the Debtors in the Disclosure Statement, under their Plan, the holders of Class 4 Claims will receive cash equal to the full amount of such holder's Allowed General Unsecured Claim within 90 days of the Effective Date in three installments. Clifford Press, however, will not be entitled to that treatment, but instead will "on the Effective Date with respect to the Stock portion of the CP Distribution and within ninety (90) days with respect to the Cash portion of the CP Distribution receive the CP Distribution provided, that the Cash portion of the CP Distribution will be distributed to the holder of the CP Claim at the same time, and in the same manner, as distributions to holders of other Allowed General Unsecured Claims."

The Debtors in their Disclosure Statement also represent that the Plan contemplates substantive consolidation (and extinguishment of intercompany debt) "into a single Chapter 11 Case solely for the purposes of all actions associated with confirmation and consummation of the Plan." The Debtors add that solely for the purposes of the Plan and the distributions and transactions contemplated thereby, all assets and liabilities of the Debtors will be treated as though they were merged, although "each of the Debtors will, as Reorganized Debtors, continue to exist after the Effective Date as separate legal entities."

The Debtors disclose the manner in which their Plan is to be implemented. They note that subject to certain conditions, they have, as a result of their DIP financing, approximately $9 million, which "is being used to provide working capital to the Debtors and the Debtors' foreign subsidiaries, including ASI." The Debtors contemplate that the DIP lenders "and other lenders yet to be determined, will provide the New Term Loan Credit Agreement to refinance the Debtors' obligations under the DIP Agreement." The Debtors represent that receipt of a "firm written commitment" for a new credit facility, satisfactory to the Creditors' Committee, is a condition of confirmation. The Debtors also indicate that this new facility "will provide the Reorganized Debtors with exit financing in the aggregate amount of $35 million, comprised of a term loan in the sum of $25 million secured by second pri-

ority liens on accounts receivables and inventory and a $10 million revolving credit facility."

The Debtors propose to implement their Plan through, *inter alia,* the cancellation of existing securities and agreements and the issuance of new securities and warrants. On the Effective Date of confirmation, the shareholders will be deemed to have approved a Management Incentive Plan. The Debtors also contemplate that confirmation will result in third party releases, injunctions and settlement of claims. The Debtors did not attach financial projections or a liquidation analysis to their Joint Disclosure Statement.

## IV. THE APPLICATION

The Debtors propose to retain Evercore to provide the following services:

(a) assist in the evaluation of the Debtors' businesses and prospects;

(b) assist in the development of the Debtors' long-term business plan and related financial projections;

(c) assist in the development of financial data and presentations to the Debtors' Board of Directors, various creditors and other third parties;

(d) analyze the Debtors' financial liquidity and evaluate alternatives to improve such liquidity;

(e) analyze various restructuring scenarios and the potential impact of the scenarios on the value of the Debtors and the recoveries of those stakeholders impacted by any restructuring, reorganization and/or recapitalization (each and all a "Restructuring") of the Debtors affecting existing or potential debt obligations or other claims including, without limitation, senior debt, junior debt, trade claims, general unsecured claims, etc. (collectively, the "Obligations");

(f) provide strategic advice with regard to restructuring or refinancing the Debtors' Obligations;

(g) evaluate the Debtors' debt capacity and alternative capital structures;

(h) participate in negotiations among the Debtors and their creditors, suppliers, lessors and other interested parties with respect to a Restructuring, an equity investment in the Debtors (an "Investment") and a possible sale, merger, or other disposition of all or a portion of the Debtors or their assets (a "Transaction");

(i) assist the Debtors in preparing marketing materials in conjunction with a possible Transaction, Investment, Financing or debtor in possession financing ("DIP Financing");

(j) assist the Debtors in identifying potential buyers or parties in interest to a Transaction and assist in the due diligence process;

(k) assist and advise the Debtors concerning the terms, conditions and impact of any proposed Transaction;

(*l* ) assist in arranging DIP Financing for the Debtors as requested;

(m) testify in court or at depositions in furtherance of a Restructuring, Investment, Financing, DIP Financing or Transaction; and

(n) provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring, Investment, Financing, DIP Financing or Transaction, as requested and mutually agreed.

Pursuant to the Application, the Debtors propose to compensate Evercore as follows:

(i) a monthly advisory fee in the amount of $100,000 in cash, with the first monthly fee payable on March 1, 2004 and additional installments in advance with

the monthly fees credited against any Restructuring Fee, Investment Fee, DIP Financing Fee, Financing Fee or Transaction Fee payable to Evercore; (ii) a Restructuring Fee upon consummation of a Restructuring approved by the Debtors' Board of Directors equal to 1.0% of the face amount of the 10¾ Senior Notes Due 2004 payable in cash, with consummation of a restructuring defined as "the execution, confirmation and consummation of the Plan pursuant to an order of the Bankruptcy Court, in the case of an in-court restructuring"; (iii) an Investment Fee upon consummation of an Investment in an amount equal to 3% of aggregate value of any Investment, defined as the "gross value of all cash, securities, and other properties paid or payable, directly or indirectly, in one transaction or a series or combination of transactions, in connection with an Investment."; (iv) a DIP Financing Fee of 1% of the total facility size of any DIP financing; (v) a Financing Fee of 1% of the total facility size of any Financing; and (vi) a Transaction fee payable in cash calculated as 1.25% of the consideration.

In their Application, the Debtors represent that the sum of the Restructuring Fee, Investment Fee, DIP Financing Fee, Financing Fee and Transaction Fee will not to exceed $2,250,000; that Evercore shall be reimbursed for its out-of-pocket expenses, including legal fees, not to exceed $10,000, working meals, and other expenses; and that the Debtors shall maintain a $25,000 expense advance for which Evercore shall account upon termination of its engagement.

John P. Fitzsimons ("Fitzsimons"), a Managing Director and Partner of Evercore, submitted an affidavit in which he disclosed that, prior to the petition date, Evercore invoiced the Debtors for $1,000,000 in fees for the seven and one half month period beginning on June 16, 2003 and ending on March 1, 2004, as well as $56,180,86 in expenses. The Debtors have paid Evercore $1,000,000 for fees and $56,180.86 for expenses. Of that sum, Evercore applied $900,000 to pre-petition services and the balance of $100,000 "has been applied to post-petition services to be rendered during the month of March 2004." Within 90 days of the petition date, Fitzsimons disclosed that the Debtors paid Evercore $250,000 in monthly fees and $23,881.35 in expenses.[2]

Fitzsimons also represented that, since June 16, 2003, Evercore had spent "a great

2. Although the Debtors have represented that Evercore is disinterested and propose to compensate it on a contingency basis, the Court notes that at least with respect to the DIP Financing Fee of 1%, which sum of $250,000 is payable upon the entry of the Final Order, that fee, for all practical purposes, was earned prepetition, as the Debtors' "Motion pursuant to Sections 105, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001 for Entry of Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Super–Priority Administrative Expense Status, (C) Modify the Automatic Stay, (D) Enter into Financing Agreement and (E) Pay the Prepetition Credit Agreement in Full and (II) Scheduling Final Hearing on Postpetition Financing and Approving Form and Manner of Notice of Such Final Hearing" was filed on the day the Debtors' petitions were filed, and the Credit Agreement was amended and restated on February 27, 2004.

Moreover, if the figures set forth in the Debtors' Joint Plan are correct, Evercore will receive on confirmation 1% of the face value of the 10¾ % Senior Notes Due 2004, which total approximately $172.8 million. Thus, before this case is more than six weeks old, Evercore, under the terms of the Engagement Letter, is entitled to $1,978,000, on top of the $1,000,000 the Debtors previously paid it, leaving just $262,000 in allowable fees before the cap of $2,250,000 is reached.

deal of time evaluating the Debtors' financial and strategic options with respect to a potential investment, sale, merger or acquisition." Apparently, Evercore was unable to provide the Debtors with sufficient information to permit them to estimate the amount of their priority and unsecured claims in their Disclosure Statement, however, except in the case of the Senior Noteholders (*see* item (ii), *supra*) for which Evercore will receive a payment·of 1% of the face amount of the notes.

## V. THE UNITED STATES TRUSTEE'S LIMITED OBJECTION

The Unites States Trustee set forth a number of objections to Evercore's retention in his Limited Objection. In his pleading, he represented that several of the objections had been resolved. For example, the United States Trustee submitted an amendment to the retention order proposed by the Debtors which would grant the Creditors' Committee authority to review "all information necessary for such committee to determine whether a basis exists for seeking a preference determination concerning Evercore," as well as an amendment pertaining to the terms of the indemnification, contribution and reimbursement provisions set forth in the engagement letter. These provisions are contained in the Assented to Order referenced in and attached to the Notice filed on April 15, 2004.

In his Limited Objection and Brief, the United States Trustee objected to the "proposed fee/compensation structure on two grounds." Citing *In re Barron,* 225 F.3d 583 (5th Cir.2000), *In re B.U.M. Int'l, Inc.,* 229 F.3d 824 (9th Cir.2000), and *In re Merry–Go–Round Enters., Inc.,* 244 B.R. 327 (Bankr.D.Md.2000), he stated the following:

First, were the Court to approve the Debtors' retaining Evercore per the Application and amended engagement letter, creditors and parties in interest, including the United States Trustee, may effectively be estopped from objecting to Evercore's fees on the basis of "reasonableness under section 330(a)", unless, per the plain language of section 328(a), the "terms and conditions [of Evercore's employment] prove to have been improvident in light of developments *not capable of being anticipated* at the time of the fixing of such terms and conditions...."

The United States Trustee added: "approval of the application as submitted may nullify the Court's independent obligation to review the reasonableness of Evercore's professional fees under section 330." Thus, the United States Trustee seeks denial of the Application to the extent the proposed order states " 'Evercore's compensation in accordance with the terms of the [amended engagement letter and attachment] shall not hereafter be subject to challenge except under the standard of review set forth under section 328(a) of the Bankruptcy Code.' "

In his Brief submitted after the March 29, 2004 hearing, the United States Trustee also noted that he requested that the Debtors and Evercore provide copies of retention orders where the terms and conditions of Evercore's employment had been approved, at the outset of the case, as reasonable and subject to review only under § 328's standard. He stated: "Of the five orders provided by the Debtors and Evercore, four contained provisions which expressly reserve the right of the United States Trustee to object to the applicant's compensation on all grounds including but not limited to the reasonableness standard provided for in section 330."

## VI. DISCUSSION

■ The issue before the Court is whether the Debtors have satisfied their

burden of establishing that the terms and conditions set forth in Evercore's Engagement Letter and described in the Application are reasonable. For the reasons set forth below, the Court finds that they have not satisfied that burden.

Section 328 provides in relevant part:

(a) The trustee ... with the court's approval may employ or authorize the employment of a professional person under section 327 or 1103 of this title ... *on any reasonable terms and conditions of employment,* including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a). In contrast to § 328 where the Court is required to determine the *reasonableness of the terms* and conditions of employment at the outset of the professional's employment, under § 330(3), the Court determines the amount of reasonable compensation for actual, necessary services rendered after consideration of "the nature, the extent and the value of such services, taking into account all relevant factors." These include the time spent, the rates charged, the necessity of the services or their benefit to the estate, as well as "whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;" and "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." 11 U.S.C. § 330(3)(A)-(E).

The relationship between § 328 and § 330 of the Bankruptcy Code was articulated by the United States Court of Appeals for the Fifth Circuit in *In re Barron,* 325 F.3d 690 (5th Cir.2003), a case in which the bankruptcy court, after authorizing the employment of an attorney pursuant to a one-third contingency fee agreement, reduced the fee award after objections were filed by the debtors and a creditor. The Fifth Circuit stated:

Sections 328 and 330 of the Bankruptcy Code govern attorneys' fees in representing bankruptcy estates. Under 11 U.S.C. § 330, attorneys' fees are reviewed for their reasonableness after representation has concluded. In contrast, Section 328 of the Bankruptcy Code allows an attorney seeking to represent a bankruptcy estate to obtain prior court approval of her compensation plan. As this Court has noted, "able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330. ..." *In re National Gypsum Co.,* 123 F.3d 861, 862 (5th Cir.1997). Under Section 328, an attorney or other professional may avoid that uncertainty by obtaining court approval of her representation and fee arrangement prior to performing the contemplated services. Section 328 provides that once a compensation plan has been approved by the bankruptcy court, "the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time

of the fixing of such terms and conditions." 11 U.S.C. § 328(a).

325 F.3d at 692–93.

The court added:

The case law of this circuit, as reflected in *National Gypsum* and *In re Texas Securities*, 218 F.3d at 445–46, has not always clearly delineated Section 328(a)'s requirement that the intervening circumstances must have been incapable of anticipation, not merely unanticipated. This distinction is not insignificant. As the court in *Barron* noted, previous Fifth Circuit cases addressed the question whether Sections 330 or 328 applied; *Barron* was the first case in this circuit to specifically address Section 328(a) in relevant part. In that decision, this Court expressly noted the limitations on bankruptcy courts' ability to revise approved fee plans. We held that the bankruptcy court applied the incorrect legal standard by finding that the circumstances were merely unforeseen; instead, the bankruptcy court should have determined whether developments, which made the approved fee plan improvident, had been incapable of anticipation at the time the award was approved.

*Id. See also In re Airspect Air, Inc.*, 288 B.R. 464 (6th Cir. BAP 2003).[3]

3. In *Airspect Air*, the court stated:

The widely accepted general rule is that bankruptcy courts, once having approved employment under § 328, may not later switch to § 330 to award fees. "Cases which have considered … § 328(a) have not allowed bankruptcy courts to later reduce previously approved contingency fees based upon the usual tests for reasonable compensation." *In re Olympic Marine Servs., Inc.*, 186 B.R. 651, 654 (Bankr. E.D.Va.1995); *see also Pitrat v. Reimers (In re Reimers)*, 972 F.2d 1127 (9th Cir.1992) (reversing bankruptcy court's reduction of fees due under pre-approved contingency fee agreement and remanding for findings under § 328(a)); *In re Merry–Go–Round Enters., Inc.*, 244 B.R. 327 (Bankr.D.Md. 2000) (approving fee of $71.2 million pursuant to a 40% contingency fee agreement previously approved by the bankruptcy court due to extreme risks assumed by counsel). In *In re Merry–Go–Round*, the bankruptcy court considered § 328(a), determined that prior approval of the fee agreement was not improvident based on the circumstances of that case and noted the "important policy consideration for honoring fee agreements with professionals." *Id.* at 337 (citing *Donaldson Lufkin & Jenrette Secs. Corp. v. Nat'l Gypsum Co. (In the Matter of Nat'l Gypsum Co.)*, 123 F.3d 861 (5th Cir.1997)). As one court has put it:

Section 330, by its own terms, is subject to § 328. Thus, § 328 must apply when the court approves a fee arrangement prior to services being rendered. Section 328 and 330 also work in tandem. In cases where the court has pre-approved the terms of employment, upon request for compensation, § 330(a) provides the framework for review while § 328 provides the standard for review.

The standard for review in § 328 cases is that of improvidence "in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a). It is not the reasonableness standard as provided in § 330. Section 330(a)'s reasonableness standard does not supplant § 328(a) and give the judge free reign to void a previously authorized employment agreement for a percentage fee. The reasonableness standard applies when the court approves the appointment of a professional, but does not approve the terms of employment.

If the bankruptcy court pre-approves the terms of the appointment, it does not have the power to make a "reasonableness" review.

*In re Westbrooks*, 202 B.R. 520, 522–23 (Bankr.N.D.Ala.1996) (citations omitted).

Under § 328, an intervening circumstance, in order to render improvident a court's decision to grant a fee application, must be one that would have affected the court's decision in the first place. It must have been relevant to that decision in some way, rendering it untenable or unwise in hindsight.

288 B.R. at 470–71.

■ Once a fee arrangement is approved under § 328, the ability of the bankruptcy court, as well as creditors and parties in interest, to review the amount of compensation payable to the professional is circumscribed. Thus, this Court must persuade itself that the terms and conditions of the proposed employment of Evercore are reasonable in view of developments capable of anticipation. Thus, the Court must foresee and anticipate circumstances, such as the Debtors' inability to obtain confirmation of their proposed Plan within the stringent time frame set forth in the Restructuring Agreement or obtain a new term loan credit facility to refinance the obligations incurred under the DIP financing, which might affect the reasonableness of the terms and conditions. This act of foresight, of course, is much more difficult than the hindsight employed in precluding reexamination of the reasonableness of the fees because of developments later determined to have been capable of anticipation.

Although a bankruptcy court is not free to modify a pre-approved agreement under § 328(a), absent a determination that circumstances exist that were incapable of being anticipated at the time of approval, the United States Court of Appeals for the Third Circuit in *In re Fed. Mogul–Global Inc.*, 348 F.3d 390 (3d Cir.2003), observed that "[t]he language [of § 328(a) ] may easily be interpreted to mean that the Court may approve the employment of a professional *on any terms and conditions that the Court finds necessary to satisfy the requirement of reasonableness.*" *Id.* at 397 (emphasis added, footnote omitted). In *Mogul–Global,* a case concerning the bankruptcy court's decision to cap the amount of compensation payable to financial advisors retained by the Official Committee of Equity Security Holders, the court held that § 328(a) authorizes bankruptcy courts to impose caps on fees that a professional may charge. The Third Circuit unequivocally rejected the committee's position that the *amount* of a professional's monthly compensation was not a "term or condition of employment" within the meaning of § 328(a) for three compelling reasons.

In the first place, the Third Circuit stated that it was guided by "Congress's statement that the word 'including' in the Bankruptcy Code is not limiting." *Id.* at 401 (citing 11 U.S.C. § 102(3) with reference to the phrase "any reasonable terms and conditions of employment, *including* on a retainer, on an hourly basis, or on a contingent fee basis."). The court also determined that "in ordinary language" the amount of compensation is a "term or condition," *id.,* and that any other notion was "contrary to precedent interpreting that provision." *Id.* (citing, *inter alia, In re Texas Sec. Inc.,* 218 F.3d 443, 445 (5th Cir.2000)). Indeed, the Third Circuit cited with approval the Seventh Circuit's decision in *In re Lytton's,* 832 F.2d 395 (7th Cir.1987). In that case, the Seventh Circuit, according to the Third Circuit, "took the view that a Bankruptcy Court is not automatically required to approve the contingent fee percentage sought in an employment application simply because that application seeks retention on a contingent fee basis," and "acknowledged the Bankruptcy Court's power to fix a contingent fee schedule of its own design." *Mogul–Global,* 348 F.3d at 402.[4]

4. In *Lytton's,* the court stated in pertinent part the following:

Cluett [the appellant] argues that the bankruptcy court definitively set a mandatory fee because the court deviated from the "standard procedure" of authorizing employment of attorneys pursuant to section 328 of the bankruptcy code and then determining the rate of their compensation at the end of the case. Section 328, however,

■ Two conclusions can be drawn from the growing body of case law construing § 328(a). The first is that a bankruptcy court has an obligation to determine the reasonableness of terms and conditions before authorizing the employment of professionals under § 328(a) and may eliminate, modify, or impose additional terms and conditions to satisfy the requirement of reasonableness. The second is that, once approved, the terms and conditions cannot be modified without a finding they were improvident. Thus, the trustee or committee seeking the employment of professionals under § 328(a) must establish that the terms and conditions of employment are reasonable, and evidence, not conclusory statements, is required to satisfy that burden.

In *In re Insilco Technologies, Inc.*, 291 B.R. 628, 633 (Bankr.D.Del.2003), the bankruptcy court set forth a list of factors to assist the determination of whether employment should be approved subject to § 328(a). In considering the propriety of "evergreen retainers," which were at issue in the case, it stated the following:

> Factors to be considered, include, but are not necessarily limited to (1) whether terms of an engagement agreement reflect normal business terms in the marketplace; (2) the relationship between the Debtor and the professionals, i.e., whether the parties involved are sophisticated business entities with equal bargaining power who engaged in an arms-length negotiation; (3) whether the retention, as proposed, is in the best

interests of the estate; (4) whether there is creditor opposition to the retention and retainer provisions; and (5) whether, given the size, circumstances and posture of the case, the amount of the retainer is itself reasonable, including whether the retainer provides the appropriate level of "risk minimization," especially in light of the existence of any other "risk-minimizing" devices, such as an administrative order and/or a carve-out.

291 B.R. at 634. *Cf. United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 238 n. 4 (3rd Cir.2003)(Judge Rendell concurring in the result). Similarly, in *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 27 (Bankr.S.D.N.Y.1991), the bankruptcy court endeavored to list criteria pertinent to the threshold determination of reasonableness. It stated the following:

> Any investment banker/advisor retention application submitted to this court must present the scope and complexity of the assignment, its anticipated duration, expected results, required resources, the extent to which highly specialized skills may be needed and the extent to which they have them or may have to obtain them, projected salaries of participating professionals, billing rates and prevailing fees for comparable engagements, current retentions in bankruptcy by the retained firm, and any estimated lost opportunity costs due to time exigencies of the job. In addi-

---

explicitly allows the employment of an attorney on a contingent fee basis. In addition, that provision does not prohibit setting a contingent fee schedule, nor does it state that setting a contingent fee schedule, or any rate of compensation, will exempt the fee-seeker from the usual bankruptcy code procedures of notice to creditors and a hearing before the bankruptcy court approves the fees. Indeed, we believe that

section 328 read in conjunction with section 330 contemplates that an attorney seeking a contingent fee payment still must apply to the bankruptcy court and that the language of section 328 expressly allows setting a rate of payment at the beginning of an attorney's employment that may later be changed.

832 F.2d at 400.

tion, the actual retention agreement between the investment banker/advisor and the client must be attached to the retention application and, the party retaining the professional must describe the process by which the financial banker/advisor has been selected. This latter requirement is aimed specifically at offsetting what we perceive as a lack of competitiveness in the selection process. Finally, the application must explain how the investment banker/advisor will eliminate, or at least reduce, the duplication of effort Judge Paskey alluded to in *[In re] Hillsborough [Holdings Corp.]*, 125 B.R. [837] at 838–39 [(Bankr. M.D.Fla.1991)], where there are armies of professionals apparently doing the same thing as the investment banker/advisor. Specifically, the intention is to avoid accountants and investment bankers/advisors massaging the same numbers twice when one trip to the masseuse would generally suffice. We liken our requirements to a financial impact statement on the estate. Only with an advance picture of the job to be accomplished will we be able to measure the results (or lack thereof) achieved.[5]

133 B.R. at 27. *See generally,* 3 Mark I. Bone et al., *Collier on Bankruptcy* (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev.2003).

In evaluating the proposed terms and conditions pertaining to Evercore's employment, the Court is mindful of the "risk minimizing devices" already in place in this case with respect to professional fees.[6] The Debtors have sought and obtained an administrative order establishing procedures for interim compensation and reimbursement of expenses of professionals. Moreover, the Final Order contains a carve-out for professional fees. And, these devices are in addition to the priority afforded administrative expense claims in the Bankruptcy Code itself. Armed with these protective devices for professionals, the Debtors nonetheless seek to retain Evercore under a contingent fee arrangement.

Based upon the existing record, including the Assented to Order, in which the parties anticipate that this Court will review Evercore's compensation under § 330 in the event "a plan of reorganization is confirmed by this Court that: (i) provides for a treatment of unsecured creditors that is materially different from, *and* (ii) provides a substantially lower recovery to the Debtors' unsecured creditors than the plan that has been prenegotiated and filed by the Debtors,"[7] the Court finds that it lacks sufficient evidence from which it can conclude that the compensation proposed to be paid to Evercore is reasonable.[8]

---

**5.** In footnotes, the court explained that information about the duration of the engagement was needed "so that time and cost of an engagement can be adjusted accordingly and the interests of the estate are protected," and that billing rates for comparable engagements could "be provided by a simple trend analysis graph based upon asset size, or something comparable." 133 B.R. at 133, n. 12 and n. 13.

**6.** *Cf. Insilco Technologies, Inc.,* 291 B.R. at 633.

**7.** Neither the terms "materially different" and "substantially lower" are defined in the As-

sented to Order, and the Court can envision a scenario where there parties are unable to agree upon the meaning of these terms. For example, is an 80% dividend "substantially lower"?

**8.** The Court is not suggesting that the compensation proposed is unreasonable, and it may be that were this Court to require Evercore to submit a fee application in accordance with § 330 Evercore might be entitled to fees in excess of the cap of $2,250,000. Nevertheless, the Court is compelled to observe that although Evercore was engaged to, among other things, "assist in the development of financial data and presentations to the Debt-

The Court has been given no information about the specific scope and complexity of the assignment or specialized skills needed for it. The Court has been given no information about the prevailing fees in the industry for comparable engagements, either in bankruptcy cases or other insolvency or workout situations. The Court has been given no information about how Evercore was selected. The Court has been given no information about the number and qualifications of the professionals employed by Evercore who are assisting the Debtors. The Court has been given no information about the compensation being paid to the professionals employed by Evercore who are assisting the Debtors. The Court has been given no information about the number of hours these employees have devoted to and intend to devote to assisting the Debtors in restructuring their financial affairs. The Court has merely been provided with vague descriptions of the tasks Evercore intends to perform. Accordingly, the Court simply is not in a position to gauge the reasonableness of the terms and conditions of Evercore's employment at this time and whether the monthly and contingent fees proposed reasonably corresponds to the value of the services which Evercore is being asked to perform.

## VII. CONCLUSION

In accordance with the foregoing the Court denies the Debtors' Application without prejudice to renewal and a satisfactory showing that the terms and conditions of Evercore's employment are reasonable.

ors' Board of Directors, various creditors and other third parties," the Debtors' Disclosure Statement is devoid of the most fundamental information about the approximate amount of debt due and owing classes of claims and interests. Given the amount of compensation that has been paid to Evercore since June 15,

## ORDER

In accordance with the Memorandum dated April 12, 2004, the Court hereby denies without prejudice the "Application pursuant to Sections 327 and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014 for an Order Authorizing Debtors to Retain and Employ Evercore Restructuring L.P. as Financial Advisors" (the "Application").

2003 when it began assisting the Debtors, the Court is hard pressed to understand why that very basic information, which presumably would have been collected by and be available to Evercore as the Debtors' financial advisor, was not made part of the Disclosure Statement.